Howard N. FEIST, Jr.

v.

The UNITED STATES.

No. 474–76.

United States Court of Claims.

Oct. 17, 1979.

---

James R. McGowan, Providence, R. I., for plaintiff. Salter, McGowan, Arcaro & Swartz, Inc., Providence, R. I., of counsel.

Marc Levey, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Senior Judge, and KUNZIG and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

EDWARD S. SMITH, Judge:

The Commissioner of Internal Revenue assessed a 100 percent penalty in the amount of $45,429.80 against plaintiff, Howard N. Feist, Jr., under the authority of section 6672 of the Internal Revenue Code of 1954, as amended [1] (I.R.C.). This assessment was based on plaintiff's asserted liability for a penalty in the amount of the federal income and social security (FICA) taxes due and owing from the Shepard Company on the wages of its employees for the third quarter of 1973. Plaintiff paid $63.70, the amount of tax due for that quarter for one employee, and filed a timely claim for refund which was disallowed.

[1]. 26 U.S.C. § 6672 (1976).

This refund suit followed. The Government counterclaimed for the unpaid portion of the penalty assessed against plaintiff but not paid. The question for decision, before us on the parties' cross-motions for summary judgment, is whether plaintiff is personally liable under section 6672 of the Internal Revenue Code of 1954 for the taxes the corporation should have withheld from the wages of its employees and should have paid over to the United States. Section 6672 imposes personal liability for taxes upon "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof."

Sections 3102(a) and 3402(a) of the Internal Revenue Code require employers to withhold from their employees' wages, at the time the wages are paid, each employee's share of his personal federal income tax and of his FICA tax. The employer is required to hold the taxes withheld from the wages of his employees in a "special fund in trust for the United States." 26 U.S.C. § 7501 (1976). An employee is automatically given credit on his individual federal tax liability for the amount of federal income taxes withheld from his wages by his employer even though the employer may not have turned over the withheld sums to the Government. 26 U.S.C. § 1462 (1976); *Bolding v. United States*, 565 F.2d 663, 669, 215 Ct.Cl. 148, 158 (1977); *Newsome v. United States*, 431 F.2d 742 (5th Cir. 1970). Once the withheld sums are credited against the employee's tax liability, the Government's only recourse is against the employer under sections 3102(b) and 3403 of 26 U.S.C. or against the corporate officer or employee [2] who is deemed to be a person

within the meaning of section 6672 who willfully failed to collect and pay over the withheld taxes to the United States.[3]

The civil penalty assessed against persons viewed by the Commissioner as having willfully breached their duty to pay over the withholding taxes is not imposed in order to punish; it is simply a means of ensuring that the tax which is unquestionably owed the Government is paid. *Botta v. Scanlon*, 314 F.2d 392, 393 (2d Cir. 1963). As it would be unjust to impose a penalty upon a person not having authority to require the corporate employer to collect and pay the taxes, the penalty is assessed only if the person had the responsibility for the collection and payment of the tax *and* willfully failed to carry out his duty. *Bolding v. United States, supra; Bauer v. United States*, 543 F.2d 142, 211 Ct.Cl. 276 (1976); *Burack v. United States*, 461 F.2d 1282, 198 Ct.Cl. 855 (1972); *McCarty v. United States*, 437 F.2d 961, 194 Ct.Cl. 42 (1971); *White v. United States*, 372 F.2d 513, 178 Ct.Cl. 765 (1967).

The question whether a particular person willfully failed to carry out his responsibility of causing the corporation to collect or pay over the taxes depends upon the facts and circumstances of each case. *Bauer v. United States, supra*, 543 F.2d at 148, 211 Ct.Cl. at 285–86. After carefully reviewing the record and having heard oral argument, we hold that plaintiff was a person responsible for the collection and payment of the taxes, but that he did not willfully fail to pay over the taxes to the Government.

I.

Plaintiff, Howard N. Feist, Jr., is the sole shareholder of the New England Mica Com-

---

**2.** The word "person" as used in section 6672 is defined in section 6671(b) as follows:

"(b) Person defined

"The term 'person', as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

**3.** The IRS, pursuant to an administrative policy, collects the penalty under section 6672 only if it is unable to collect from the employer. See IRS Policy Statement P–5–60, IRS Manual, MT 1218–56 (Feb. 25, 1976), *reprinted in* [1979] 8 Stand.Fed.Tax Rep. (CCH) ¶ 5569.01.

pany (Mica). Mica purchased the common and preferred stock of the Shepard Company (Shepard) in 1970; hence, plaintiff became the indirect owner of Shepard after Mica bought the stock of Shepard. Shepard, a large retail department store which started doing business in 1870, had several branches. It employed 600 to 800 persons. At the time Mica purchased Shepard's stock, Shepard was in a precarious financial position. After the acquisition, plaintiff became Shepard's treasurer and chairman of its board of directors.

Mica also owned the stock of Denholm & McKay Company, Inc., a department store located in Worcester with a branch in Auburn, Massachusetts, and Gladdings, Inc. (Gladdings), a women's specialty store in Providence, Rhode Island. After the purchase of Shepard, Mica merged Shepard's retail operations in Rhode Island with those of Gladdings. Plaintiff thought that combining several of the back-office operations, i. e., the credit, accounting, and warehousing departments, would result in substantial savings.

During the first quarter of 1972, Mr. Fred Cooper, president of Shepard, who was responsible for the day-to-day management of the company, informed plaintiff that Shepard was short of working capital. Plaintiff negotiated a loan of several million dollars on behalf of Shepard from James Talcott, Inc. (Talcott), a factoring firm which is engaged in the business of lending money on receivables and inventories. During the loan negotiations, plaintiff provided Talcott with every document regarding the financial history and operations of Shepard for the previous 5 years. Talcott secured its loan to Shepard by taking a security interest in Shepard's accounts receivable and inventory. The Talcott-Shepard agreement itself is not in the record.

After arranging the loan from Talcott, plaintiff regularly policed the ongoing operations of the business. He reviewed the monthly financial statements prepared by the firm's controller and attended weekly meetings with Shepard's president. The belief that the infusion of more working capital, via the loan from Talcott, would end Shepard's financial difficulties was short-lived. After a good 1972 Christmas season, Shepard had a poor first quarter in 1973. During March or April of 1973, Shepard's president told plaintiff that the company needed an additional one-half to one million dollars in working capital. During the spring of 1973, plaintiff took an active part in raising additional funds which Shepard needed in order to purchase merchandise. Plaintiff arranged a loan of several million dollars from the General Electric Credit Corporation in June 1973.

Aside from loans, several other solutions to the firm's financial problems were explored. Consideration was given to a merger of Shepard with Denholm & McKay. However, in August 1973, it was discovered that Shepard's inventory had been overvalued by $300,000 to $500,000. Also, in August 1973, a group of attorneys representing the various creditors of Shepard called an informal creditors' meeting and demanded payment of some of the corporate debts. Plaintiff attended this meeting and was successful in delaying the creditors.

Plaintiff decided to sell the stock of Shepard after Shepard's president informed plaintiff that even more working capital was needed in order to purchase merchandise for the 1973 Christmas season. As plaintiff had come to believe that Shepard had exhausted its lending resources, plaintiff sold Shepard's stock to Eastern Dry Goods Company (Eastern) on September 12, 1973. Prior to the sale, plaintiff had investigated the business reputations of the principals of Eastern. He had inquired about their standing in the business community and conducted a check with Dun & Bradstreet. The investigation indicated that the principals of Eastern were reliable persons.

On or about September 12, 1973, plaintiff was informed that Shepard was delinquent in some of its deposits of federal taxes for the third quarter of 1973 which ended September 30, 1973. All other quarters had been paid in a timely manner. Plaintiff notified the purchasers of Shepard of the delinquency and he received an oral assur-

ance by Eastern that the taxes would be paid "immediately."[4] On the date of sale, September 12, 1973, Shepard had approximately $10,000 to $15,000 in a company bank account and approximately $50,000 to $60,000 scattered throughout the stores in the company's several hundred cash registers. These funds were sufficient to pay Shepard's taxes.

Eastern had represented to plaintiff that it would continue to operate Shepard as an ongoing business with the same management which had previously handled the day-to-day operations of Shepard and which had previously overseen Shepard's payment of employment and withholding taxes and filing of the returns while plaintiff was Shepard's owner. When plaintiff resigned from his positions as treasurer and chairman of Shepard's board of directors at the closing on September 12, 1973, the third quarter was only 80 percent complete. As of September 12, 1973, Shepard had paid the Internal Revenue Service $123,495.79 of its total Form 941 liability of $176,301.64 for the third quarter, or approximately 70 percent of its total liability for the full quarter ended September 30.

On the day after the purchase of Shepard's stock by Eastern, September 13, 1973, a principal of Eastern withdrew $13,600 of Shepard's funds from its bank account. Subsequently, this principal was indicted by a Federal grand jury and charged with illegally withdrawing corporate funds in violation of federal law. On or about September 12, 1973, the new owners of Shepard announced that all of Shepard's merchandise would be sold at a 20 percent reduction in price and, shortly after the sale, James Talcott, Inc., seized Shepard's inventory. On September 18, 1973, three creditors of Shepard petitioned Shepard into bankruptcy. Shepard was adjudicated bankrupt on September 26, 1973. During the time that plaintiff was Shepard's indirect owner, treasurer, and chairman of its board, he held important positions in numerous other business enterprises.[5] Though plaintiff was Shepard's treasurer, personnel in the controller's office and the bookkeeping staff performed the mechanical duties of collecting the tax, preparing the tax returns, and filing the returns.

In addition to plaintiff's control over Shepard, plaintiff had a controlling interest in a business management and consulting firm called Business Analysts, Inc., which provided management consulting services to Shepard for a fixed monthly fee of $6,000. Business Analysts paid plaintiff for his services to Shepard. As of the date of the sale, the fees for Business Analysts had been prepaid through December 1973. Plaintiff also indirectly owned Bayrock Realty Trust which leased to Shepard some of the real estate used by Shepard as a department store. The rental payments were paid through October 1973. In addition, Shepard rented store fixtures from American Guaranty Corporation. Plaintiff owned some of the stock of American Guaranty Corporation, a publicly held leasing corporation. The record indicates that some of these prepayments were made according to contractual provisions, and it does not appear that any of the payments were made other than under established operating procedures. The record contains no evidence

---

4. Shepard did in fact pay an additional $5,400 on September 17, 1973.

5. During the period from July 1, 1973, to October 31, 1973, plaintiff held the following positions: President and director of Business Analysts, Inc.; president and director of Mayflower Inn, Inc.; treasurer and director of American Guaranty Corporation; treasurer and director of American Medical Leasing Corporation; treasurer and director of American Food Service Equipment Corporation; treasurer and chairman of the board of New England Mica Company; treasurer and director of Waltham-Hampden Grinding Wheel Co., Inc.; president, treasurer, and director of Caribe Knitwear, Inc.; president, treasurer, and director of Cayey Industries, Inc.; treasurer and director of O'Toole Company, Inc.; president and trustee of Textile Properties Trust; president and trustee of Mayflower Properties Trust; president and trustee of Bay Rock Realty Trust; president, treasurer, and director of Willow Creek Ranch, Inc.; president, treasurer, and director of Deer Run Ranch, Inc.; president, treasurer, and director of Denholm & McKay Company, Inc.; and treasurer and director of Avery Piano Company.

indicating that the prepayments were made at a time when the taxes owed were delinquent or that the prepayment would jeopardize Shepard's ability to pay over the taxes.

## II.

■ Plaintiff's contention that he was not a responsible person within the purview of section 6672, for the reasons that he was not the person who prepared and filed the company's tax returns and because he resigned from his position as treasurer on the date he discovered the taxes had not been paid, is without merit. Any corporate officer, or employee with the power and authority to "avoid the default" or to direct the payment of the taxes is a responsible person within the meaning of section 6672. *White v. United States*, 372 F.2d 513, 516, 178 Ct.Cl. 765, 771 (1967). It has long been recognized that the liability is not limited to those who perform the merely mechanical function of preparing the tax forms, collecting the taxes from the wages of the employees, and filing the returns. *Harrington v. United States*, 504 F.2d 1306, 1312 (1st Cir. 1974); *United States v. Graham*, 309 F.2d 210 (9th Cir. 1962). In many instances, the employees with responsibility for performing the clerical duties of collecting and paying over the taxes and preparing the returns do not have the authority to authorize the payment or to order the nonpayment of the tax. As stated in *McCarty, supra*, 437 F.2d at 967–68, 194 Ct.Cl. at 55:

> As a general proposition it may be safely postulated that one who is the founder, chief stockholder, president, and member of the board of directors of a corporation (such as the plaintiff) is rebuttably presumed to be the person responsible under section [6672] of the Code and is thus liable for the penalty, in the absence of an affirmative showing by him that in actual fact he lacked the ultimate authority to withhold and pay the employment taxes in question, or that his

omission was not willful in the statutory sense.

Plaintiff was chairman of the board, the indirect owner, and treasurer of Shepard and is, therefore, presumed to be a person responsible for the collection and payment of the tax. The facts overwhelmingly establish that plaintiff had the power to avoid default and that, during the years he was the indirect owner of Shepard, plaintiff exercised control over the fiscal operations of the company.[6] The fact that Shepard had a controller who reported to the president and a sizable staff which performed the mechanical function of filing the returns does not rebut the inference that plaintiff had the right to control the company's financial decisions. In fact, the record contains evidence that plaintiff's instructions to the management of Shepard were to place first priority on the payment of wages and taxes. At most, the indication is that there possibly was more than one responsible person.

As treasurer of the company, it was plaintiff's responsibility to oversee the financial management of the corporation and, thus, to ensure that the trust fund taxes were paid to the Government and not used for other business purposes. Plaintiff, by pointing out that he held high positions in many other companies at the same time he was Shepard's treasurer, attempts to have the court infer that he was too busy or too important to have responsibility for the payment of the trust fund taxes to the United States. The fact that plaintiff was a busy man who held many offices in numerous enterprises only indicates that he may have been so overburdened he was unable to handle all of his responsibilities well; it does not establish that he did not have the responsibility for payment of the tax.

## III.

■ Until an employee is paid compensation which he has earned, he is but one of

---

6. Plaintiff personally negotiated loans from James Talcott, Inc., and the General Electric Credit Corporation. He negotiated the sale of Shepard's stock. He attended weekly meetings with Shepard's president. He review the profit and loss statements and the financial statements of the company prepared by the controller. He discussed the profit and loss statements with banks and lending institutions.

the creditors of his employer. Once he is paid, the Government's entitlement to its portion of such compensation occurs simultaneously. The Government may be said to have beneficial "title" to this latter portion although it is held by the employer. For this reason, courts have dealt strictly and firmly with "responsible persons" who have "willfully failed to pay over" these trust funds to the Government.

■■■ Thus, our second line of inquiry must be whether plaintiff willfully failed to pay over the trust fund taxes. "Willfulness" has been almost universally defined as an intentional, voluntary, conscious act or omission.[7] In order to be willful for the purposes of this section, it is not necessary that there be an intent to defraud or to harm the Government.[8] One who knows that the taxes are due and that the money is available for payment but who diverts the money to creditors of the corporation has often been viewed as having willfully disregarded the duty. *Bolding v. United States*, 565 F.2d 663, 215 Ct.Cl. 148 (1977); *Maggy v. United States*, 560 F.2d 1372 (9th Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978). In general, willfulness can often be shown by proving that the responsible person used money available in the corporation's coffers for other business purposes such as payment of creditors. *Monday v. United States*, 421 F.2d 1210, 1215 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Sorenson v. United States*, 521 F.2d 325 (9th Cir. 1975) (wages paid to employees with knowledge that there were insufficient funds to pay both wages and taxes); *Brown v. United States*, 591 F.2d 1136 (5th Cir. 1979) (responsible persons held to have willfully failed to pay because they held the trust funds collected in corporate account so the corporation could have the use of funds

for a longer period of time). It is thus clear that the trust fund taxes may not be made subject to common business risks.

■■■ Mere negligence is not sufficient proof of willfulness. *Bauer v. United States*, 543 F.2d 142, 211 Ct.Cl. 276 (1976); *Kalb v. United States*, 505 F.2d 506 (2d Cir. 1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Dudley v. United States*, 428 F.2d 1196, 1200 (9th Cir. 1970). This is not to say that the asserted liability may lightly be averted. Willfulness can be proved by showing that the responsible person recklessly disregarded his duty to collect, account for, and pay over the trust fund taxes or by showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted. *Brown v. United States, supra.* The concomitant of this rule must be that absence of willfulness can be proved by an affirmative showing that the responsible person did *not* disregard his duties, and that he undertook all reasonable efforts to see that such taxes would in fact be paid, in circumstances where the employer had the means of payment and could reasonably be expected to make the payment. Here the employer had the means of payment and those who normally prepared the returns and paid the taxes continued in its employ after the transfer of ownership. Plaintiff's requirement that the new owners agree to immediate payment of the taxes is such an affirmative act.

Especially significant in the circumstances of this case is the fact, accepted by defendant in its motion for partial summary judgment, that plaintiff had no knowledge of Shepard's failure until just prior to the closing. He could not "knowingly" have preferred creditors other than the Government, prior to that moment. Upon learning of the deficiency at the last min-

---

7. *Bolding v. United States*, 565 F.2d 663, 215 Ct.Cl. 148 (1977); *Teel v. United States*, 529 F.2d 903 (9th Cir. 1976); *McCarty v. United States*, 437 F.2d 961, 194 Ct.Cl. 42 (1971); *see also Mazo v. United States*, 591 F.2d 1151 (5th Cir. 1979); *Scott v. United States*, 354 F.2d 292, 295, 173 Ct.Cl. 650, 655 (1965).

8. *Emshwiller v. United States*, 565 F.2d 1042 (8th Cir. 1977); *Bolding v. United States, supra* note 7; *Burden v. United States*, 486 F.2d 302 (10th Cir. 1973), *cert. denied*, 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 109 (1974); *Burack v. United States*, 461 F.2d 1282, 198 Ct.Cl. 855 (1972); *Dudley v. United States*, 428 F.2d 1196 (9th Cir. 1970).

ute, he did not knowingly sit silent or prefer other creditors, but instead did all he could reasonably do in the circumstances to see that the taxes were paid. Plaintiff manifested not a "lack of fault," but the only positive effort reasonably available to him to see that amounts which had been withheld were in fact paid over to the Government.

■ The awesome power granted the Internal Revenue Service by section 6672, to pursue by notice and demand any (or all) of a number of possibly responsible persons, is tempered by this requirement that there be a finding of *willful* failure to collect, account for, and pay over the tax. The development of this penalty from its original appearance in little-known provisions having to do with taxes on firearms has not been a history of the imposition of an absolute liability, either by Congress or by the courts.

■ In *Slodov v. United States*, 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978), the Supreme Court observed that "[t]he fact that the provision imposes a 'penalty' and is violated only by a 'willful failure' is itself strong evidence that it was not intended to impose liability without personal fault." Personal fault being a necessary element of willfulness, relevant evidence bearing on the element of personal fault may not be ignored.

■ We cannot say that, under the special circumstances of the case now before this court, plaintiff willfully failed to pay over the trust fund taxes. The totality of the circumstances indicate that plaintiff acted in good faith in regard to the trust fund taxes. The taxes had never been delinquent for any prior quarters, and substantial payment had been made for the quarter in question. As a result of plaintiff's investigation into the business reputation of the principals of Eastern, plaintiff had every reason to believe that they would uphold their word and pay the delinquent taxes "immediately." This is especially true in light of the fact that Eastern had represented to plaintiff that it intended to

continue to operate Shepard as a department store. It was reasonable for plaintiff to presume that Eastern, which intended to continue to operate the concern as an ongoing business and to continue to run the business with the same management and substantially the same number of employees, would continue to pay over the trust fund taxes as required by law. Importantly, the oral agreement, when put in perspective of the possession of the corporation of the means of payment, together with the short period of time plaintiff both knew of the deficiency and continued as a responsible person, was an affirmative act showing that plaintiff intended that the taxes be paid. The short time frame involved here is particularly important. There was no prior history of delinquency in this or in any of plaintiff's other businesses. Plaintiff learned about the delinquency shortly before he resigned as Shepard's treasurer and chairman of its board. Immediately upon learning of the delinquency, he arranged to have the taxes paid. He could not have foreseen that one of Eastern's principals would illegally appropriate for his own use corporate funds which were available for payment of these taxes. As noted in section I, *supra*, approximately $50,000 to $60,000 was on hand, scattered throughout the stores in their cash registers. It would be a complete disregard of business reality to hold that plaintiff could or should have suspended, at the last minute, closing transactions carefully negotiated and scheduled for transfer of ownership of the business, in order to collect the cash in the cash registers at a time when the stores were open for business, and to interrupt the firm's normal business operations. To impose such a duty upon plaintiff would come close to making him a guarantor and would impose a penalty without personal fault. This is not permissible under section 6672. *Slodov v. United States, supra.*

The Government's position, that willfulness is proved by simply showing that plaintiff knew the taxes were owing and did not immediately order their payment, ignores all of the surrounding relevant circumstances which must be examined when determin-

ing whether the failure to collect and pay over the taxes was willful. Such an order to the controller could immediately have been countermanded by the new owners, whereupon it might be asserted that plaintiff should have suspended the transfer of ownership until such order had been carried out. Business reality does not permit such an alternative and is more consistent with plaintiff's decision to require the purchasers themselves to agree to "immediate" payment. Unlike a multitude of other cases, where the evidence showed that the responsible person preferred other creditors over the Government or subjected the funds to business risks, or recklessly disregarded the employer's obligation, the fact that plaintiff, upon learning of the delinquency at the eleventh hour, entered into an agreement with apparently responsible business persons indicates that plaintiff intended and reasonably expected that the Shepard Company would and could pay over the taxes to the Government.

The procedures presently available for resolution of disputes under section 6672 contain many inherent defects which are burdensome to the Government and to taxpayers alike. The Government is under constraint to pursue all persons who may have shared the "responsibility" in order to recover "the Government's money," otherwise the person or persons who were actually responsible and willful may escape the penalty. This places a burden of inconvenience, expense, and stigma upon many who were not responsible and/or willful, in order to protect themselves from imposition of an undeserved penalty. The usual deficiency procedures are not provided, and there is no way for the Government or the taxpayer to bring before one tribunal all of those who may have been responsible or all of the other witnesses. In the instant case, although plaintiff was deposed at length and responded to interrogatories as well as requests for admissions, there is no direct record of the positions or possible testimony of other potential "responsible persons" other than a notation, in the answer herein, of assessment of the penalty against one other person, action on which was suspended by the parties pending the outcome of this case. In the circumstances, this court has no choice but to render its judgment on the basis of the record before it.

## IV.

That part of plaintiff's cross-motion for summary judgment on the question of whether he was a responsible person is denied, and to that extent defendant's motion for partial summary judgment is granted. Plaintiff's motion for summary judgment on the question of willfulness is granted; defendant's motion thereon is denied; and defendant's counterclaim is dismissed. The case is remanded to the trial division under Rule 131(c) for a computation of the amount to be refunded to plaintiff.