Hassan **KADAH**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 81–CV–1253.

United States District Court,
N.D. New York.

Jan. 2, 1985.

Costello, Cooney & Fearon, Syracuse, for plaintiff; Warren W. Bader, Syracuse, N.Y., of counsel.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant; D. Patrick Mullarkey, Chief, Civ. Trial Section, Northern Region, Steven Lyons, Jonathan B. Forman, Washington, D.C., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Invoking the jurisdiction conferred upon this Court by the provisions of 28 U.S.C. § 1346(a)(1) and § 7422 of the Internal Revenue Code of 1954 ("I.R.C."), plaintiff Hassan Kadah ("Kadah") seeks to recover the 100% penalty assessment he has paid pursuant to I.R.C. § 6672 in discharge of the unsatisfied withholding and Federal Insurance Contributions Act ("FICA") tax liabilities of Custom Technology Corporation ("CTC") for the third and fourth quarters of 1976 and the first quarter of 1977.[1] The

---

1. The 100% penalty assessment against Kadah was made on February 2, 1981 in the amount of $38,524.40 and a notice with demand for payment was given on the same date. On April 10,

trial was conducted without a jury on May 3rd and 4th, 1984 [2] and no post-trial submissions were received other than a letter from the Government filed on May 14, 1984 and a supplemental trial memorandum filed by plaintiff on May 21, 1984. In response to an inquiry from the Court on September 26, 1984, both sides declined the opportunity to file further post-trial submissions. There follow the findings of fact and conclusions of law mandated by Fed.R.Civ.P. 52(a).

## II

At all times relevant to this action, Kadah owned and operated Omnetics, Inc., located in Syracuse, New York. Omnetics was organized in 1971 and is a corporation engaged in the manufacture of electronic timers and phase controls. CTC was incorporated in 1974 in Santa Clara, California by Daniel Schell, William Robson and Richard Brewer. Its business involved the design and development of integrated circuits and microelectronic chips for other companies. In connection with his operation of Omnetics, Kadah required the services of design firms such as CTC from time to time. Although he had never transacted any business with CTC, Kadah learned about that company through its contacts at Monosil Corporation, another Santa Clara corporation engaged in electronic design work. Through these contacts, it came to Kadah's attention that CTC had cash flow problems and needed capital for expansion. Sometime in July of 1976, Kadah met with Schell and Robson at the CTC premises and reviewed with them the operations and financial needs of their company. Apparently convinced that Omnetics would benefit thereby, Kadah decided to purchase a controlling interest in CTC and to provide it with necessary funds.

By resolution adopted on July 22, 1976 and agreed to in writing on the same date by the plaintiff, CTC authorized the sale of 520,000 of its shares to the plaintiff for the sum of $52,000. According to the resolution, plaintiff was to provide the corporation with "expansion capital" in the amount of $100,000, the sale was subject to verification that the short term liabilities of the company were not in excess of $50,000 and plaintiff was to have the opportunity to review unaudited balance sheets and profit and loss statements.[3] Issuance of the shares to plaintiff was subject to the approval of the Commissioner of Corporations of the State of California. At the time of the adoption of the resolution, the Board of Directors consisted of Daniel Schell, William Robson, Richard Brewer, Joseph Brenner and Harold Robson.

In an application dated August 11, 1976, CTC sought the approval of the transfer of shares to plaintiff. Government's Exhibit ZZ. The application was signed by Daniel Schell as president and listed the name of plaintiff as Chairman of the Board of Directors of CTC.[4] Although stock certificates were not delivered to him until some time later, it appears that plaintiff became the owner of his shares after state approval of the transfer sometime in early Octo-

---

1981, the United States received $100 in partial payment of the assessment and, on December 18, 1982, the Government received $42,508.39 in full payment of the balance of the assessment plus interest. Claims for refund were duly filed but disallowed by the Internal Revenue Service.

2. Only two witnesses testified at the trial—plaintiff Hassan Kadah and George Avery, who was hired by Kadah as a consultant for, and later as president of CTC. A statement of undisputed facts was filed as part of the pre-trial stipulation on April 1, 1983, and numerous exhibits were received in evidence. Deposition testimony also was submitted for the Court's consideration.

3. The resolution, Government's Exhibit JJ, included a representation by plaintiff that he would not alter the policies of the corporation with regard to the employment of Schell and Robson, that he would consent to an amendment to provide that all stockholders retain their proportionate interests on any further issuance of shares, and that 20% of the corporate profits would be paid to employees on a profit sharing incentive plan.

4. There were 13,000 shares outstanding at the time of the application and the holdings were as follows: Daniel Schell, 6,000 shares; William Robson, 6,000 shares; Joseph Brenner, 500 shares; Richard Brewer, 500 shares.

ber of 1976 [5] and that he began to direct the affairs of the company in his capacity as Chairman of the Board on or about October 5, 1976. On that day, plaintiff forwarded an inter-office memo to various employees with the request that they indicate their choice between a profit sharing and a stock option plan. Government's Exhibit Q. He also asked for the cooperation of the employees in the operation of the business of CTC. By letter dated October 19, 1976, plaintiff accepted the resignation of Mr. Schell as president, Government's Exhibit N, and, on October 21, 1976, he advised Mr. Schell regarding severance pay and the purchase by CTC of the 60,000 shares held by Schell. Government's Exhibit K. In an inter-office memo dated October 19, 1976, plaintiff notified all CTC personnel of the Schell resignation, appointed an executive committee to manage operations, and made the following announcement: "As chairman, I shall seek filling the position of a president that [sic] can manage the affairs of CTC in a business manner. Until then I am assuming the responsibility of communicating with the executive committee to conduct the operations of CTC." Government's Exhibit M. On the same date, plaintiff furnished written instructions on operating procedure to the executive committee and advised committee members that "other matters relating to decisions effecting [sic] corporate directions on major committments [sic] and overall policy shall be directed to the attention of the chairman for disposition." Government's Exhibit L. William Robson was designated as chairman of the executive committee and reported to plaintiff.

In addition to his duties as Chairman of the Board, plaintiff assumed the duties of chief executive officer and so notified John Luke, vice president of American Microsystems, Inc., in a letter dated October 19, 1976. Government's Exhibit O. Signing as Chairman of CTC, plaintiff wrote to the president of Computervision Corporation on October 20, 1976 regarding the development of a computer-aided design system for CTC. Government's Exhibit BB. By corporate resolution dated November 12, 1976, and filed with the Bank of America, plaintiff was designated as president of CTC with check signing authority. Although he customarily delegated this authority to others, plaintiff was empowered to sign corporate checks either as chairman or president in several resolutions adopted during his tenure as a stockholder. Plaintiff actually drew checks on CTC accounts on only three occasions during the entire time he was associated with the company. During the period November, 1976 through March, 1977, payments were made by CTC to creditors other than the United States in sums of approximately $50,000 a month.

Sometime in mid-November, 1976, William Robson introduced plaintiff to George Earl Avery at a meeting held at the San Francisco airport. Avery recently had concluded a ten-year period of employment at American Microsystems, and the airport discussion centered around the possibility of Avery's employment as president of CTC. About ten days after the airport meeting, Avery flew to Syracuse at plaintiff's request to observe the Omnetics operation. He remained there for two days, and plaintiff told him that he wanted him to understand how the business of Omnetics was complementary to that of CTC. Plaintiff suggested that Avery be paid as a consultant to Omnetics for the purpose of evaluating CTC. In early December, 1976, plaintiff introduced Avery to CTC personnel as a consultant for Omnetics, although CTC ultimately paid the consulting fees. Plaintiff announced that CTC employees should turn to Avery for technical decisions in his absence, and he directed Avery to familiarize himself with the work, develop-

---

**5.** By virtue of a 10 for 1 stock split on October 14, 1976, Schell and Robson became the owners of 60,000 shares each and Brenner and Brewer became the owners of 5,000 shares each. All continued to own their shares throughout the period in question with the exception of Schell, whose ownership was terminated in December of 1976. Although plaintiff's stock certificate was delivered to him during the last week in October, 1976, Government's Exhibit MM, it was not signed by the president and secretary until December 29, 1976, Government's Exhibit II.

mental activities and personnel at CTC. Avery maintained frequent telephone contact with plaintiff and discussed the status of various jobs with him.

On the occasion of a visit by plaintiff to San Diego in mid-December, 1976, Avery brought to plaintiff's attention the monthly financial reports of CTC showing the unpaid taxes. Plaintiff said he was aware of the situation and would address the problem in the near future. The annual shareholders meeting of CTC was held on December 28, 1976 at the offices of the corporation. Just before the meeting, Avery discussed the financial status of the corporation with plaintiff and expressed his concern with the past due taxes and with the company's failure to meet current payroll taxes. Plaintiff responded that he would take care of the situation and that Avery should be satisfied with plaintiff's directions in the matter. Plaintiff chaired the stockholders meeting, and he was elected to the Board of Directors along with Avery and Richard Brewer. Government's Exhibit T. The Board then met and appointed Avery as president, William Robson as vice president, Herbert Green, an attorney, as secretary-treasurer and plaintiff as chairman. Government's Exhibit S. A discussion concerning unpaid federal taxes ensued. Mr. Green was assigned to contact the Internal Revenue Service to develop a schedule for the payment of the taxes. Plaintiff issued a direction that no payments were to be made until such a schedule was defined. Plaintiff was concerned with the corporation's cash flow in general and required that no creditor be paid until the last possible moment.

Following the December meetings, Avery remained in close contact with plaintiff regarding the affairs of the corporation. These contacts occurred by telephone and on the occasions of plaintiff's visits to CTC headquarters. Plaintiff specified which creditors should be paid and which credi-

tors should not be paid. He was concerned not only with the cash flow situation but also with the progress of each job in which CTC was involved. A number of Omnetics employees were placed on the CTC payroll at plaintiff's direction while they performed work for Omnetics. Avery wanted to bill Omnetics for overhead plus a normal profit margin, but plaintiff advised that only the overhead would be paid. When Avery protested that Omnetics was paying only fifty percent of overhead, plaintiff said that he owned the company and would do as he pleased. Plaintiff involved himself in negotiating contracts for CTC and in directing the work relating to those contracts. Avery continued to express his concern about the unpaid taxes and became increasingly anxious after the visit of an IRS representative in mid-January of 1977. Plaintiff again directed him not to make any payments until a payment schedule was negotiated by Herbert Green. Avery was unable to locate Green until mid-February of 1977 and then pressed him to resolve the tax issue. On March 4, 1977, Green wrote to plaintiff regarding the fiscal problems of CTC requiring plaintiff's "immediate attention." Among the items listed in the letter was the amount then due the Internal Revenue Service for 1976 payroll taxes—$38,877.57. Government's Exhibit G.[6]

Troubled by the possibility of personal liability for the payroll taxes, Avery called plaintiff in Syracuse on March 11 to inquire about the mounting tax arrears. Plaintiff said that he would handle the matter on his next visit to California. Avery advised that he would resign if more specific information were not forthcoming and plaintiff refused to make any commitment at that time. Accordingly, by letter dated the same day, Avery tendered his resignation to the Board of Directors, Government's Exhibit F, with copies to plaintiff and Herbert Green.[7] The resignation of William

---

**6.** The letter included the following advice: "Your attention is called to the fact that, as to the tax items, the officers and directors of the company may be personally chargeable with the portion thereof that is attributable to employee withholdings." Government's Exhibit G.

**7.** In this letter, Avery expressed his "extreme concern about damage to [his] professional rep-

W. Robson as vice president of CTC was also tendered on March 11, 1977. Government's Exhibit E. Among the reasons given by Robson for his resignation was CTC's "inability to pay outstanding debts, including, but not limited to, back taxes to both Federal and State Governments...." The first item in the final status report addressed to plaintiff by George Avery relative to various matters pending at CTC was the following: "1. A meeting scheduled with Mrs. Freed of the I.R.S. for last Thursday was postponed and should be re-established this week. Herb Green and I were to meet with her to discuss current status of CTC's past due obligations." Government's Exhibit D.

On March 15, 1977, a special meeting of the Board of Directors was held at the corporate headquarters at Santa Clara, California. Plaintiff was present, along with Richard Brewer and Herbert Green, the corporate secretary. The resignations of Avery and Robson were accepted, Brewer was appointed president of the corporation, and necessary changes were directed regarding authorized signatories on the CTC bank accounts. Government's Exhibit V. Negotiations for the sale of plaintiff's interest in CTC to Brewer followed the Board meeting and culminated, on March 21, 1977, in an agreement for the sale of shares. Government's Exhibit W. In accordance with the terms of the agreement, the following events took place on March 21: Plaintiff transferred his 520,000 shares to Brewer and Brewer executed a promissory note, payable in one year, in the amount of $52,000 in payment therefor; and a promissory note, in the sum of $30,500, representing the CTC indebtedness to plaintiff, was executed by CTC to plaintiff and guaranteed by Brewer, payable in one year with interest at nine percent. Government's Exhibit II. The agreement of sale required plaintiff to lend to Brewer or Brewer's designee the sum of $20,000, within ninety days after execution of the

agreement, upon the receipt of promissory notes personally executed by Brewer. The notes representing this loan were to bear interest at nine percent per annum, with payment to be made within one year after execution. In the agreement, Brewer represented that he was "familiar with all aspects of said corporation's financial status and structure, as well as, and to the same extent as is Kadah...." *Id.* Although it is not clear from the evidence when plaintiff resigned as Chairman of the Board, a check dated March 29, 1977 in the sum of $1,509.50 was drawn by plaintiff on the CTC account at Bank of America payable to himself. Government's Exhibit AA.

On or about July 1, 1977, plaintiff paid to CTC the last $5,000 of the $20,000 he had promised to lend Brewer or his designee. Between September 21, 1976 and July 1, 1977, plaintiff had loaned a total of $70,000 to CTC. Before making the final payment, plaintiff inquired if arrangements had been made for the liquidation of the indebtedness to the IRS. Brewer replied in the affirmative, and it appears that he had in fact made some agreement for regular installment payments. Due to default in these payments by CTC, a delegate of the Secretary of the Treasury made an assessment against plaintiff for a 100% penalty in the amount of $38,524.40 with respect to the unpaid withholding and FICA taxes of CTC for the third and fourth quarters of 1976 and the first quarter of 1977, pursuant to § 6672 of the I.R.C. The assessment was made on February 2, 1981 and a notice with demand for payment of the assessment was given to plaintiff on the same day. On April 10, 1981, the United States received partial payment of the 100% penalty assessment and, on December 18, 1982, the Government received from plaintiff $42,508.39, representing the balance of the assessment plus interest. Plaintiff duly filed claims for refund and the claims were disallowed by the IRS.

utation resulting from Custom Technology Corporation's inability to pay outstanding obligations including, but not limited to, past due taxes to both State and Federal Governments

resulting from a lack of financing as previously promised by Hassan Kadah." Government's Exhibit F.

Plaintiff commenced this action on November 16, 1981 and filed his supplemental complaint on August 2, 1982.

### III

■ An employer is required to deduct and withhold social security and income taxes from wages paid to employees, 26 U.S.C. §§ 3102(a), 3402(a), and such taxes must be held by the employer as a special fund in trust for the United States, *id.* § 7501(a). A payroll tax return reporting the withheld taxes must be filed by the employer every calendar quarter and is due on the last day of the first month following the quarter. I.R.S. Reg. § 31.6011(a)–4. The tax liability of the employer arises when the wages are paid, rather than on the due date of the tax return. *Tiffany v. United States*, 228 F.Supp. 700, 702 (D.N.J. 1963). To protect the Government against losses sustained by the failure of employers to remit the taxes, § 6672 of the I.R.C., 26 U.S.C. § 6672, was enacted to provide another source from which to collect the funds. *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir.1975). Section 6672 provides, in pertinent part, as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). The 100% penalty liability established by this statute must be paid upon notice and demand by the Secretary or his delegate and is assessed and collected in the same manner as other taxes. *Id.* § 6671(a).

■ A "person," as referred to in § 6672 of the I.R.C., includes a corporate officer or employee who is under a duty to collect, account for or pay over the trust fund taxes. *Id.* § 6671(b). It is not necessary that a responsible person be invested with the routine duties of collection and payment; it is sufficient if he has the authority to avoid the default giving rise to the statutory violation. *Harrington v. United States*, 504 F.2d 1306, 1312 (1st Cir.1974). In approaching the issue of personal responsibility for non-payment of withheld taxes,

> the courts have tended to disregard the mechanical functions of the various corporate officers, and, instead, have searched for the person or persons who could have seen to it that the taxes were paid, a person with ultimate authority over expenditures of corporate funds who can fairly be said to be responsible for the corporation's failure to pay over its taxes.

*Commonwealth National Bank v. United States*, 665 F.2d 743, 752 (5th Cir.1982) (quoting Annot., 22 A.L.R.3d 8, 50 (1968)). Those corporate officers who are directly involved in making decisions as to the payment of creditors and disbursement of funds generally are those who hold the power to see to the payment to the Government of the taxes withheld. *Braden v. United States*, 318 F.Supp. 1189, 1193–94 (S.D.Ohio 1970), *aff'd*, 442 F.2d 342 (6th Cir.1972), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1973) (citing *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)). Liability has been extended to those having significant authority to determine what bills should be paid from corporate funds and when payment should be made. *Pacific National Insurance Co. v. United States*, 422 F.2d 26, 30–31 (9th Cir.), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970); *United States v. Graham*, 309 F.2d 210, 212 (9th Cir.1962).

In determining whether an individual is responsible for the collection or remittance of corporate trust fund taxes, the following factors have been considered relevant: the duties of the individual according to the corporation's by-laws; the ability of the individual to sign corporate checks; the

status of the individual as officer, director or shareholder; the ability of the individual to control the financial affairs of the corporation; the authority of the individual to hire and fire employees; the stake of the individual in the success of the corporation; the identity of the individual paying the corporate creditors; and the identity of the signer of the corporate tax returns. *Braden v. United States*, 318 F.Supp. 1189, 1194 (S.D.Ohio 1970), *aff'd*, 442 F.2d 342 (6th Cir.1972), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1973); *Datlof v. United States*, 252 F.Supp. 11, 32–33 (E.D.Pa.1966); *see United States v. Sotelo*, 436 U.S. 268, 279–80 nn. 12–13, 98 S.Ct. 1795, 1802 nn. 12–13, 56 L.Ed.2d 275 (1978).

■ A responsible person acts "willfully" within the meaning of I.R.C. § 6672 when he voluntarily, consciously and intentionally decides not to remit the withheld funds. *Kalb v. United States*, 505 F.2d 506, 511 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975) (citing *Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)). Neither criminal intent nor intent to defraud is required, but only the voluntary and intentional decision not to collect or pay over. *Bloom v. United States*, 272 F.2d 215, 223 (9th Cir.1959), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960); *Scott v. United States*, 354 F.2d 292, 295, 173 Ct.Cl. 650 (1965). The willfullness requirement is met when it is shown that there was a conscious and deliberate choice on the part of the responsible person to prefer other creditors over the Government. *Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). *"Monday* also points out, as has to be the case, that willful conduct 'may also indicate a reckless disregard for obvious or known risks.'" *Kalb v. United States*, 505 F.2d at 511 (quoting *Monday v. United States*, 421 F.2d at 1215). "Willful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the

Government." *Kalb v. United States*, 505 F.2d at 511. However, proof of simple negligence does not satisfy the willful conduct requirement imposed by the statute. *Dudley v. United States*, 428 F.2d 1196, 1200 (9th Cir.1970).

## IV

### A. *The Plaintiff as Responsible Person*

■ The evidence clearly establishes plaintiff's responsibility for payment of the withheld taxes from the time he took control of CTC in early October of 1976 until he terminated his connection with the corporation at the end of March, 1977. He immediately assumed the title of Chairman of the Board of Directors, a position, according to the corporate by-laws, in which he was presiding officer of the body responsible for controlling all the business and affairs of the corporation. Government's Exhibit DDD. In addition, he was the majority shareholder of CTC and was at all times authorized to sign corporate checks. He had the greatest stake in the success of the corporation and, although not personally present at all times, maintained an active interest in managing the company's business activities. The financial affairs of the corporation were within his sole control, and the decision to hire George Avery as president was his alone. After he accepted the resignation of Daniel Schell as president and before Avery was hired, he made it clear that he would make all decisions relating to "corporate directions on major commitments and overall policy," and he alone appointed the executive committee charged with managing day-to-day operations. He assumed the duties of chief operating officer and became directly involved in dealings with CTC's customers. Plaintiff loaned funds to the corporation, and continued to infuse it with capital on a regular basis.

From the time that Avery became associated with CTC, first as a consultant and then as president, he was at all times subject to the direction and control of plaintiff. Avery maintained frequent telephone con-

tact with plaintiff and regularly reported to him on the status of company business both by telephone and in person on those occasions when plaintiff was present at company headquarters. Although plaintiff did not sign the tax returns, unaudited financial statements prepared by the certified public accountants retained by the corporation were available to plaintiff at all times, and directions for the payment of various items of corporate indebtedness were given to Avery by the plaintiff. Government's Exhibits A, C, Z, OO. That plaintiff considered himself answerable to no one in respect of the affairs of CTC is apparent from his treatment of CTC as an adjunct to the operation of his other corporation, Omnetics, the work of which was performed by CTC at fifty percent of cost at plaintiff's insistence.

■ As to plaintiff's claim that he cannot in any event be responsible for trust fund taxes accruing between March 22, 1977 and March 31, 1977 by reason of the sale of his stock to Richard Brewer on March 21, 1977 the evidence is that plaintiff continued to have check-signing authority and continued to loan money to the corporation after March 21. Plaintiff signed a check payable to himself for more than $1,500 on March 29, 1977, and there is no indication that plaintiff resigned as Chairman of the Board before March 31. In short, other than the sale of his shares on March 21 and the terms of his agreement with Brewer relating thereto, there is no evidence respecting the termination of plaintiff's functions in the corporation prior to March 31, 1977.

### B. *The Plaintiff's Willful Failure to Remit*

■ It is apparent from the testimony and the exhibits that plaintiff, as a responsible person, made a conscious and deliberate choice to prefer other creditors over the Government during the period in question. While corporate bills in amounts averaging $50,000 per month were being paid, and while various sums of money were being loaned to the corporation by plaintiff, the trust funds were not remitted to the Government. Plaintiff gave specific instructions to Avery that creditors were not to be paid until the last possible moment and that no payments were to be made to the Government until a schedule was worked out by Herbert Green. The Court credits Mr. Avery's testimony that he repeatedly brought the matter to plaintiff's attention and that plaintiff just as frequently postponed consideration of the matter, even after Mr. Green himself advised plaintiff that the payroll tax arrears required plaintiff's "immediate attention." When plaintiff refused to make any firm commitment respecting the payment of taxes, both Avery and Robson resigned. From the very beginning of his association with CTC, plaintiff was aware of the defaults in remitting withholding and FICA taxes, and he made the decision to disregard the problem in the face of increasing liabilities. There is no question that plaintiff was fully aware of the tax arrears during the entire time he was a responsible person. Even before he took control of the corporation, the financial statements available to him reflected the taxes when due.

Relying on *Feist v. United States*, 607 F.2d 954, 221 Ct.Cl. 531 (1979), plaintiff claims that the element of willfulness is negated by the assurances given him by Brewer, the purchaser of his shares, that the tax obligations would be paid; by his agreement to loan $20,000 within ninety days after the sale of the shares, allegedly to satisfy tax obligations; and by Brewer's arrangement with the IRS to pay the tax liability in installments. In *Feist*, the controlling stockholder in a department store chain sold his shares to a reputedly reliable company. On or about the date of transfer, the seller discovered that the payroll taxes for a portion of one quarter had not been paid. He notified the purchasers of the delinquency and was assured that the taxes would be paid at once. When the sale was consummated as scheduled, there were sufficient funds in the corporate bank accounts and in the several hundred cash registers in the company's stores to satisfy the tax obligations. As a result of a theft

from the bank account, a seizure of merchandise, and an adjudication of bankruptcy, the debt to the Government never was paid by the corporation and the IRS looked to the seller for satisfaction. In granting summary judgment to the plaintiff on the question of willfulness, the Court held:

> It would be a complete disregard of business reality to hold that plaintiff could or should have suspended, at the last minute, closing transactions carefully negotiated and scheduled for transfer of ownership of the business, in order to collect the cash in the cash registers at a time when the stores were open for business, and to interrupt the firm's normal business operations.... Unlike a multitude of other cases, where the evidence showed that the responsible person preferred other creditors over the Government or subjected the funds to business risks, or recklessly disregarded the employer's obligation, the fact that plaintiff, upon learning of the delinquency at the eleventh hour, entered into an agreement with apparently responsible business persons indicates that plaintiff intended and reasonably expected that the Shepard Company would and could pay over the taxes to the Government.

*United States v. Feist*, 607 F.2d at 962–63.

There are significant differences between the factual situation revealed in *Feist* and those found in the case at bar. Most significant is the lack of sufficient funds in the CTC accounts to satisfy the obligation to the Government at the time of plaintiff's stock transfer to Brewer. Although plaintiff claims that his understanding was that the $20,000 in additional funds to be advanced by him would go toward the past due payroll taxes, there was no basis for such an understanding. Plaintiff agreed to loan the $20,000 to Richard Brewer "or his designee" and that designee could have been any person or entity. Moreover, the money was to be loaned over a period of time, and it was not until after the sale that Brewer entered into the installment arrangement with the IRS on behalf of CTC, an arrangement ultimately not honored by Brewer or CTC. Although plaintiff claims that he understood Brewer to be a millionaire, there is no proof that he undertook an investigation to verify that understanding. There was no basis for any reasonable expectation on the part of plaintiff that CTC or Brewer would or could pay over the substantial obligations due the Government accrued during plaintiff's stewardship at CTC. The case at bar falls within the "multitude of cases" where the evidence demonstrates a preference of other creditors over the Government. Finally, the defaults in the case at bar occurred over a fairly long period of time, while the default in *Feist* was for only a portion of one quarter.

### C. *The Third Quarter of 1976*

■ Although plaintiff entered into an agreement for the purchase of shares in CTC on July 22, 1976, he did not become involved in the affairs of the company until early in October, 1976. Within the definitions described in section III, *supra*, plaintiff could not have become a responsible person until he began directing the business of the corporation in October. The only exception is found in the holding that

> a "responsible person" under § 6672 may violate the "pay over" requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501, but that § 7501 does not impress a trust on after-acquired funds, and that the responsible person consequently does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

*Slodov v. United States*, 436 U.S. 238, 259–60, 98 S.Ct. 1778, 1791, 56 L.Ed.2d 251 (1978). The financial statements of CTC clearly demonstrate that, at the time plain-

tiff assumed control of the corporation in October, no funds were available in the corporate treasury with which to pay the trust fund taxes. It was just for the purpose of bringing cash to the company that plaintiff was first approached by those then operating the CTC business. Any funds generated by the business after plaintiff took charge, and any cash infused by plaintiff by way of loans or stock purchases, certainly cannot be said to be "directly traceable" to collected taxes. Plaintiff has established that he is not liable for the penalty assessment imposed upon him for the third quarter of 1976.

The Government's claim that "even if Hassan Kadah was not willful until February or March of 1977, he would still be liable for the 100 percent penalty for all of the quarters involved since payments for wages and other creditors made during that period were in excess of the unpaid tax liabilities for the periods involved herein," United States' Proposed Conclusions of Law ¶ 32, is rejected. The cases cited by the Government, *Garsky v. United States,* 600 F.2d 86 (7th Cir.1979); *Kizzier v. United States,* 598 F.2d 1128 (8th Cir.1979); *Mazo v. United States,* 591 F.2d 1151 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979), in support of this proposition, all involved individuals who were responsible persons during all relevant calendar quarters and whose liability therefore was extended to unencumbered funds received after they became aware of defaults occurring during previous quarters. As has been demonstrated, plaintiff was not a responsible person during the third quarter of 1976.

### V

Since plaintiff has sustained his burden of proof regarding his entitlement to recover the penalty assessment he has paid for the third quarter of 1976, *United States v. Lease,* 346 F.2d 696 (2d Cir.1965), judgment shall be entered in his favor in the amount so paid. If the parties cannot agree on the proper amount, an application to the Court to fix the correct sum will be entertained.

Plaintiff has failed to carry his burden of proof with respect to his claims to recover the penalty assessments for the fourth quarter of 1976 and the first quarter of 1977, and judgment shall enter in favor of defendant as to those claims.

It is so Ordered.