**In re Colene B. STANLEY, Debtor.**

**Bankruptcy No. 91–04028–8–ATS.**

United States Bankruptcy Court,
E.D. North Carolina,
Wilson Division.

Aug. 13, 1992.

Peter J. Sarda, Raleigh, N.C., for debtor.

David B. Blair, Trial Atty., Tax Div., U.S. Dep't. of Justice, Washington, D.C., for I.R.S.

### ORDER

J. RICH LEONARD, Bankruptcy Judge.

This matter arises from the conflict between the attempt of a noble lady to keep

---

her anti-poverty agency afloat during its declining days and the stern dictate of the Internal Revenue Code that employers promptly pay over withheld taxes to the government. After hearing a full day of testimony in Wilmington on August 4, 1992, and reviewing the exhibits and pertinent authorities, decision is appropriate.

FACTUAL FINDINGS

The debtor, 69 years old, was appointed the Executive Director of SENCland Community Action, Inc. (hereinafter SENCland) in 1985. She had worked for the agency in a variety of positions for the prior 18 years. Prior to her employment at SENCland, Ms. Stanley worked intermittently as a domestic employee and full-time as a seamstress at Boys' Home at Lake Waccamaw. A high school graduate, she commendably returned to college in 1973, obtaining a B.S. degree from Shaw University in 1976. Immediately before her appointment to the top position, she was the administrative assistant to the former Executive Director.

As Executive Director, Ms. Stanley had authority for day-to-day operations; major program changes and personnel actions required the approval of the Board of Directors. Financial disbursements required the joint signatures of Ms. Stanley and the Chairman of the Board, Clemmon Jacobs.

SENCland provided a variety of programs for low-income residents of three counties in southeastern North Carolina, including Head Start, community centers for the elderly, transportation, weatherization of substandard housing, and job training. It was not a small enterprise; its annual budget at one point exceeded $2.2 million, and it had a payroll of 40 to 50 employees. Through a variety of grant programs, federal, state and local governments supplied virtually all of its operating funds.

Although Ms. Stanley's management style was to attack a problem directly when it came to her attention, each of her project directors and department heads had considerable leeway in managing their own areas. The Chief Finance Officer of SENCland until her resignation on December 2, 1986 was Glenda Little, and Ms. Stanley relied on Ms. Little for overall management of SENCland's financial affairs.

The financial operation of SENCland had difficulties during Ms. Stanley's tenure. An audit performed on May 27, 1986 (for the year ending November 30, 1985) did not express an opinion on the accuracy of the agency financial statements because the "Agency has not maintained adequate records of fixed assets, inventory of food commodities, travel advances or beginning balances." A separate report to the Board of Directors on internal controls found lack of reconciliation of ledgers, poor cash management resulting in late payment of bills, and inadequate monitoring of grant requirements.

Ms. Stanley attempted to deal with the problems raised by the audit. An August 20, 1986 memo to Ms. Little follows up on action taken at a Board of Directors meeting on August 12, and directs that a reorganization of the department take place very soon. Ms. Stanley's continued dissatisfaction with Ms. Little's performance is reflected in her memo to the board chairman of October 7, 1986, stating her view that "a transition would be necessary in department personnel." Implicit in this memo is the degree to which Ms. Stanley's hands were tied, however, since she was told to "hold off" on any personnel changes. Ms. Stanley continued to address the situation. On October 10, 1986, she sent a handwritten memo to Ms. Little on the subject of "Agency Internal Controls" and directed her to develop an improvement plan by November 4, 1986. This deteriorating relationship led to Ms. Little's resignation of December 2, 1986.

Although the problems with the internal financial procedures during Ms. Stanley's tenure were significant, the more serious and ultimately fatal problem was the lack of adequate cash flow. As federal money in the mid-eighties became less available and competition for funds more keen, SENCland could not muster sufficient resources to meet its significant ongoing expenses. To deal with this chronic cash shortage, Ms. Little kept completed and signed checks (which were prepared by a

contractor off-site based on vouchers submitted by SENCland) in her custody until she believed the bank balance was sufficient to cover them. Accordingly, bills were often paid much later than the date on the check would indicate. During the relevant time period, federal withholding taxes from employees' salaries were routinely transmitted late to the Internal Revenue Service, leading to the assessment of penalties and interest.

The extent to which Ms. Stanley knew that Ms. Little held back signed checks was sharply disputed in the testimony. Ms. Little testified that she and Ms. Stanley met weekly, and Ms. Stanley gave directions as to which checks to send and which to hold back. A memo from Ms. Little to Ms. Stanley suggests that such a meeting took place on at least one occasion. On the other hand, Ms. Stanley asserted that she generally relied on Ms. Little to pay the bills in a timely fashion, and gave no specific instructions on a check-by-check basis. In the chaotic final days of the agency, it is likely the truth is somewhere in the middle: on occasion Ms. Little used her best judgment as to which bills to pay first, and at other times she received guidance from Ms. Stanley. On this testimony, the court cannot conclude that Ms. Stanley specifically directed Ms. Little to defer sending the tax checks that are the basis of this dispute.

What is clear is that by the fall of 1986, the agency was in desperate financial shape and Ms. Stanley knew it. Ms. Little reported in a September 22, 1986 memo to Ms. Stanley that the agency was continuing to expend funds from its administrative budget that were not available to it; at that point, the agency has already overspent its administrative budget by $77,000, with no identified source of replacement funds. In response to Ms. Stanley's request for an improvement plan, Ms. Little replied that a "total improvement plan depends on the availability of funds. We cannot meet all operating expenses such as payroll, bills, travel, etc. unless funds are available." At the time of Ms. Little's resignation, Ms. Stanley, even if she did not know the specifics, knew or reasonably should have known that the agency was delinquent on many of its obligations.

Upon Ms. Little's resignation, Margaret Kelly was named Acting Finance Director. Ms. Stanley directed Ms. Kelly to make an immediate assessment of the financial records of SENCland. Upon doing so, she found, in a locked cabinet, executed checks to vendors that had never been sent. In Ms. Little's locked desk drawer, she found executed checks to the Internal Revenue Service for withheld payroll taxes that had not been transmitted. Ms. Kelly asked another employee to witness her discovery of the checks, and then notified Ms. Stanley. Ms. Stanley appeared shocked that the tax checks had not been spent, and locked them back in the drawer while she sought guidance from the Board of Directors and its attorney and the Internal Revenue Service. The checks were never forwarded, and subsequently disappeared.

On January 9, 1987, Ms. Stanley responded to a request from the Internal Revenue Service for payment with a plea for an extension of time until February 15. On January 14, she sought guidance from counsel about the tax situation. The agency came to an abrupt end on February 13, 1987, when its Board voted to dissolve. On February 23, 1987, the Board directed Ms. Stanley to make no further disbursements without express approval.

The record does not allow for a precise calculation of SENCland's balance sheet during its last two months of operation. It is clear that from the time the I.R.S. checks were discovered until the agency was disbanded eight weeks later, it met its bi-weekly payroll of approximately $10,000 on four occasions, totalling approximately $40,000. Additionally, other bills continued to be paid. From February 11, 1987 until March 19, 1987, a period of time during which the agency was shutting down, checks in the amount of $15,964.79 were written on its account. Thus the conclusion is inescapable that the agency continued to expend a considerable portion of its funds for other purposes after Ms. Stanley undeniably knew that 1986 payroll taxes due the government were delinquent.

## CONCLUSIONS OF LAW

■ This case presents a single legal issue: whether Ms. Stanley violated 26 U.S.C. § 6672, which provides in pertinent part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or accounted for and paid over.

Counsel have stipulated that Ms. Stanley was a responsible person within the meaning of this statute, and that the amount of the penalty assessed against her is $29,-342.46. The battle is joined over whether her conduct was "willful," an issue on which the taxpayer has the burden of proof. *Smith v. U.S.*, 894 F.2d 1549 (11th Cir.1990). A heightened standard of willfulness such as would apply in a criminal context, where the government would be required to show that Ms. Stanley acted with fraudulent intent or bad motive, is not relevant here. *Williams v. U.S.*, 931 F.2d 805 (11th Cir.1991). Rather, willfulness in a civil context is defined as "meaning, in general, a voluntary, conscious and intentional act." *Smith, supra,* at 1553.

■ Courts construing this provision have routinely held that a responsible person acts willfully if she allows payments to be made to other creditors after knowing that withholding taxes have not been remitted. *Smith, supra; Williams, supra; Caterino v. U.S.*, 794 F.2d 1 (1st Cir.1986); *Feist v. U.S.*, 607 F.2d 954, 221 Ct.Cl. 531 (1979). The law in the Fourth Circuit, although stated cryptically, is in accord. *U.S. v. Pomponio*, 635 F.2d 293 (4th Cir. 1980) ("This intentional preference of other creditors was sufficient to establish the element of willfulness within the statute.") It is no defense that the responsible person thinks there will in the future be sufficient funds from which to pay the overdue taxes;

a troubled enterprise may not use tax trust funds to make the government "an unwilling partner in a business experiencing economic difficulties." *Thibodeau v. U.S.*, 828 F.2d 1499, 1506 (11th Cir.1987).

■ Counsel for Ms. Stanley rely on the decision in *Holley v. U.S.*, 89–1 U.S.T.C. 87,375 (E.D.Wis.1989), where a volunteer director of a social services program was relieved of liability under § 6672 due to financial confusion and a lack of funds in the waning days of the agency. *Holley,* however, is easily distinguished, for in that case there was genuine uncertainty about whether any taxes at all were owed, and repeated efforts were made to clarify the situation with the Internal Revenue Service. In this case, there is simply no doubt that Ms. Stanley, at least from the time she discovered the executed but unmailed checks, knew that payroll taxes had not been remitted.

Closer to the facts of this case is *Cooper v. U.S.*, 539 F.Supp. 117 (E.D.Va.1982), *aff'd* 705 F.2d 442 (4th Cir.1983). Like Ms. Stanley, Dr. Cooper was the executive director of a not-for-profit corporation experiencing financial difficulties. He claimed that although he was aware that taxes were unpaid, his primary responsibility was to keep the agency going by any means possible, and there were insufficient funds to do this and pay the delinquent taxes. The court held that these facts, without more, established liability.

So it is with Ms. Stanley. She was not sophisticated in the financial dealings of her agency, and her actions were taken solely to improve the lives of the poor citizens of her community and with no thought of personal gain. Nonetheless, she was the senior officer of an organization administering millions of dollars of public funds, and it is not unfair to hold her accountable for violation of a basic provision of tax law applicable to every employer in the nation. As the Eleventh Circuit has aptly stated, "The seeds of common sense compassion ... find scant hospitality

on this rock hard legal landscape." *Williams, supra,* at 811.[1]

For the foregoing reasons, the objection of the debtor to the claim of the Internal Revenue Service is overruled. The claim is allowed in the undisputed amount.

SO ORDERED.

---

1. The government advanced a second theory to establish that Ms. Stanley acted willfully: that she acted with reckless disregard of her responsibilities to insure that the taxes were paid. Because it seems abundantly clear to the court that the government is entitled to prevail on their first theory, the court sees no need to reach this alternative assertion.