**Stephen FARKAS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–100T.**

United States Court of Federal Claims.

July 1, 2003.

---

**20.** *See* notes 1 and 9, *supra.*

Douglas R. Eisenberg, Gallo Geffner Fenster, P.C., Paramus, New Jersey, argued for the plaintiff.

Robert Stoddart, Tax Branch, Court of Federal Claims Section, United States Department of Justice, argued for the defendant.

## OPINION AND ORDER

BLOCK, Judge.

This case is before the court following a trial held on March 24 and 25, 2003, in Newark, New Jersey. The central issue is whether plaintiff, Stephen Farkas, is a "responsible person" who willfully failed to pay his company's payroll taxes and is, consequently, liable for the unpaid tax and penalty under 26 U.S.C. § 6672 ("section 6672"). The payroll taxes at issue are the taxes withheld from an employee's paycheck by the employer. Under the Internal Revenue Code, employers are required to hold that money in trust for the United States until the date the tax is due. The government in this case alleges that, although Mr. Farkas withheld money from his employees' wages, he willfully failed to pay that money over to the Internal Revenue Service (IRS).

Mr. Farkas initially brought this action against the United States after paying $101.29 of the alleged tax liability. Defendant counterclaimed for the full sum of the tax liability, in the amount of $1,492,978.20. Defendant also asserted an affirmative defense under 28 U.S.C. § 2514 ("section 2514"), which provides for the forfeiture of fraudulent claims. For the reasons explained below, this court finds that Mr. Farkas was a responsible person who willfully failed to pay his company's payroll taxes. Further, this court finds that Mr. Farkas fraudulently prevented the IRS from collecting said taxes, and, therefore, his claim in this court is forfeited under section 2514.

## I. Facts

The relevant periods during which Farkas allegedly failed to pay his company's employment taxes are the fourth quarters of 1992 and 1994. In order to properly explain the ultimate decision rendered by the court, it is helpful to probe the events leading up to that critical time.

Mr. Farkas graduated from the University of Miami with a degree in business management and organization. Between 1968 and 1972, Farkas worked for R.J. Reynolds, and, thereafter, between 1972 and 1980, as a salesman for a pharmaceutical company called "Oregon Pharmaceuticals." Tr. at 33–34. Farkas then purchased a franchise called "General Business Services," which provided business consulting and bookkeeping services. *Id.*

Sometime between 1982 and 1984, Farkas fathered his first employee leasing company [1] called "Payroll Alternative Corporation" ("PAC"). Tr. at 31. PAC, perhaps ironically, ran into exactly the same tax trouble that gives rise to the case at bar—alleged failure to proffer payroll taxes. Specifically, Farkas asserts that PAC actually paid its payroll taxes, but, through a bookkeeping error, the government credited the money to a different business. Tr. at 36–37. When Mr. Farkas journeyed to the local IRS office to discuss a demand made by the IRS to collect back taxes to the tune of $120,000, Farkas was asked, but could not produce the money. *Id.* Subsequently, after meeting this time in his office with an IRS agent, Farkas broke off the conversation when a renewed demand for payment was made. He then telephoned his lawyer in another room for privacy's sake to relay this unhappy state of affairs. *Id.* When he returned, the agents allegedly had mystically vanished. Thus no agreement as to payment was ever reached. As of the date of trial, it is unclear whether Farkas ever paid PAC's deficient payroll taxes.[2]

---

1. Employee leasing companies lease employees to smaller companies, the benefit being that smaller companies pay a standard contract price to the employee leasing company, which in turn takes care of such things as the insurance plans and payroll taxes for its employees. The employees receive paychecks from the employee leasing company, rather than from the companies for whom they work.

2. When asked about the status of PAC's tax debt, Mr. Farkas gave the following testimony on direct examination:

In 1985, Farkas met with a Mr. John Oleniacz to discuss forming another employee leasing company to be called "Alternative Staffing Services" ("ASI").[3] *Id.* at 45. ASI was incorporated on December 7th, 1987, and it initially conducted business from Oleniacz' office, where he was already operating an accounting business, a tax business and real estate business. *Id.* While the shares of ASI were divided evenly, the responsibilities of Oleniacz and Farkas differed. With his previous business experience in tax and accounting, Oleniacz headed up the accounting side of ASI, while Farkas was in charge of sales and marketing. *Id.* at 50. Both men earned an annual salary of $46,800. Joint Ex. 27.

Under this structure, the company began to grow, and by the end of 1987, Farkas had hired four people as sales representatives. This trend continued, and by 1988 the company had grown to include at least ten people. *Id.* at 54–55.

As the company continued to grow, Mr. Farkas decided to employ someone in house to do the accounting work since he felt that "Oleniacz, Inc. may not have been the best place to keep the accounting." *Id.* at 55. In 1989, Farkas hired James Bell to create and manage the accounting department and to serve as the chief financial officer of ASI. *Id.* at 59. Mr. Bell previously worked for a company called "Ace Scientific." When Ace Scientific went out of business, Bell transferred its staff to ASI in order to create ASI's new accounting department. *Id.* at 61. Among the staff brought over from Ace Sci-

entific was Mr. Greg Ward, who served as the Certified Public Accountant for ASI until 1997. *Id.* Mr. Ward certified ASI's financial statements as well as its tax forms during the periods relevant in this case.

In July of 1990, in an attempt to raise capital, ASI underwent corporate restructuring in connection with a private stock offering. The first step in the restructuring was to decrease the respective stock ownership percentage of Oleniacz and Farkas from 50% each to 25.5%. Joint Ex. 32. Oleniacz and Farkas then divided the company's 1,000,000 shares of stock as follows: 255,000 shares to Oleniacz and Farkas each; 20,000 shares to James Bell; and 470,000 shares available by private intrastate offering at $10 per share. *Id.*

After the stock offering, ASI continued to operate reasonably well until it became apparent that Oleniacz was misappropriating funds from the company. Although there is some evidence that the misappropriations began as early as 1989, it is clear that this mishandling of funds was brought to Farkas' attention by Greg Ward in 1991 when he queried Mr. Farkas about the matter. Tr. at 82; Joint Ex. 7 at 4. It was only after conferring with Mr. Ward that Farkas confronted Mr. Oleniacz about the matter. Farkas then instructed Oleniacz to "do a note," which was evidenced by recording the amounts taken on the company's tax forms as "loans to stockholders." Tr. at 81–82.

Q: Do you know the status of those liabilities with Payroll Alternative Corporation? Are they paid up? Do you know whatever happened to it?
A: Well, over a period of time—at first it was six years, and then they increased it to 10 years. Ten years have passed, and it just automatically goes away, I assume.
Tr. at 38.
Farkas later gave somewhat contradictory testimony regarding his personal responsibility for PAC's back taxes, and the action the IRS took to collect them:
Q: Now, the liability remained, correct? What action did the IRS take to try and collect it?
A: Actually, the only thing they did is they put the 100 percent penalty on me. There's a story behind why they did that, but they actually did nothing to collect it over the years.

Q: Did they file a lien against you?
A: Well, the lien was—I'm just going to assume that it's one, but the lien was the penalty, the penalty they put against me.
Q: Did they ever levy your salary?
A: No.
Q: What is the name of your wife?
A: Diane.
Q: Did they ever levy her salary?
A: No, but a person from the IRS did contact her employer.
Tr. at 42

3. Although "Action Staffing Services" remained the moniker for Mr. Farkas' company until 1991 when it renamed itself "Alternative Staffing Incorporated," this court will refer to the company by the acronym ASI, rather than ASS for obvious reasons.

ASI's financial situation began to deteriorate. In 1991, the company declared nearly $10.5 million in gross receipts on its tax forms, which was a nearly $6.8 million increase from the previous year. Joint Ex. 8. Despite this increase, ASI reported no taxable income and actually posted a $470, 857 loss—much of this due, Farkas alleges, to the $302,408 lost as so-called "loans to stockholders." *Id.* Also notable, is that notwithstanding ASI's reported loss, Farkas took $85,800 as salary in 1991—nearly double his salary from the previous year—and Oleniacz took $83,600, up from $51,300 the previous year. Tr. 81; Joint Ex. 7, 8.

This trend continued into 1992 even after Farkas had knowledge of Oleniacz' alleged pilfering. ASI's tax forms for the critical year of 1992 show approximately $25.1 million in gross income, but a $414,038 loss. Joint Ex. 9. At the same time, loans to stockholders topped out at $613,323, and Farkas increased his salary by $1,650 to $87,450. *Id.* Farkas personally signed the 1992 tax form as president. *Id.*

By 1993, ASI's financial situation was in dire straits, and Mr. Farkas took action. Sometime between July and August of 1993, Greg Ward presented Farkas with the company's financial statements for the 1992 tax year. Tr. at 89–90. The statements indicated, and Greg Ward told Farkas, that Oleniacz had been taking approximately $20,000 a week for several weeks. *Id.* Only after the Ward revelation did Mr. Farkas call his attorney, Ted Margolis, to inquire about how to fire Oleniacz. Farkas fired Oleniacz only weeks later. *Id.* at 91. In response to a government interrogatory asking for the total amount Oleniacz took, Farkas answered that it was somewhere between $700,000 and $800,000. Joint Ex. 13 at 15.

Allegedly because of the financial distress by Oleniacz's mishandling of funds, ASI began to fall behind in its payment of the federal payroll taxes. Sometime in 1993 before Oleniacz was fired, Farkas alleges that Oleniacz told him that a payment plan was set up by Oleniacz and Ward with the IRS whereby ASI would make payments of $10,000 per week in order to pay off the tax deficiency. Tr. at 117. ASI did in fact make weekly payments of $10,000, though the existence of any arrangement or agreement with the IRS is unsubstantiated in the record.

The $10,000 payments stopped in June 1995, when ASI went out of business. On April 3, 1996, defendant assessed against Farkas a 100% penalty representing the unpaid trust fund taxes of ASI for the payroll tax quarters ending December 31, 1992 and December 31, 1994, totaling $1,492,978.20. Mr. Farkas proffered $101.29 of the assessed penalty, simultaneously filing this suit against the defendant for a refund of the penalty.

In the wake of ASI's demise in 1995, several branches of the old ASI were conglomerated to form a new employee leasing company called Professional Employer Services, Inc. ("PES"). PES was made up of New York ASI, Pennsylvania ASI, ASI New Jersey and ASI Benefits Plus (collectively referred to by the parties as "ASI Group"). Joint Ex. 60–65; Tr. at 322–323. The new president of PES was a former saleswoman at ASI named Terri Munkirs, although Farkas still remained closely connected to PES serving as a "general consultant." [4] Although operating under a different title PES picked up business where old ASI left off: it assumed old ASI's clients, employed old ASI's staff, and performed the same services. Joint Ex. 60–65. Relatedly, and as discussed more fully below, this court finds that Mr. Farkas and Ms. Munkirs engaged in a fraudulent scheme whereby Farkas' salary from PES was paid to his wife instead of Mr. Farkas so that his salary would be insulated from IRS liens arising out of old ASI's payroll tax deficiency. It is this scheme that serves as the basis for the government's forfeiture claim under section 2514.

## II. Discussion

A. *Liability Under Section 6672 of the Internal Revenue Code*

Section 6672 of the Internal Revenue Code (IRC) provides in relevant part:

---

4. By this time, Farkas had formed yet another new company, "Professional Employer Consulting Services," of which he was the sole shareholder and, aside from a secretary who may or may not have worked for him for a time, its sole employee. Tr. at 363–364.

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a) (2000).

A short explanation of the payroll tax system is useful to place the applicability of section 6672 in context. Under the Federal Tax Deposit System, every employer is required to withhold Federal Insurance Contributions Act (FICA) tax from employees' wages "as and when" they are paid. 26 U.S.C. §§ 3102, 3402(a) (2000). These withholding funds are used primarily to pay the taxpayers' individual income tax as well as Social Security and Medicare benefits. Instead of paying the federal government directly, employers deposit the withheld funds with an authorized financial institution such as a commercial bank until they are collected by the U.S. Treasury.[5] INTERNAL REVENUE SERVICE, PUBLICATION 15, CIRCULAR E, EMPLOYER'S TAX GUIDE (2003). These funds are deposited along with a Federal Tax Deposit (FTD) coupon listing the employer's name, address, and Employer Identification Number (EIN), which allows the IRS to earmark and track the deposits. *Id.* Under the Internal Revenue Code, the deposited withholdings "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). Hence, the withheld taxes are commonly referred to as "trust fund taxes," although the trust established is somewhat different than a traditional common law trust. INTERNAL REVENUE SERVICE, SMALL BUS/SELF-EMPLOYED, BUSINESS WITH EMPLOYEES, TRUST FUND TAXES (2003).

These trust fund tax deposits are accounted for by the IRS on a quarterly basis through the use of a tax return form known as "Form 941." Employers must file Form 941 within one month from the end of the prior quarter, and penalties are assessed for late filings.[6] *Id.* More importantly for the purposes of this case, however, employers are liable under 26 U.S.C. §§ 3102(b) and 3403, for the payment of these trust fund taxes once they pay employees only their net wages. *Id.* It is this liability that section 6672 enforces.

Section 6672 holds delinquent employers personally responsible for 100% of the amount withheld from their employees. The purpose of the 100% penalty provision " 'is to permit the taxing authority to reach those [persons] responsible for the corporation's failure to pay the taxes which are owing.' " *Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed.Cir.1984) (quoting *White v. United States,* 178 Ct.Cl. 765, 372 F.2d 513, 516 (1967)). "Though the legislative history is uninformative, 'it is evident from the face of the section that [§ 6672] was designed to cut through the organizational form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax.' " *Id.* (quoting *Pacific National Insurance Co. v. United States,* 422 F.2d 26, 31 and n. 12 (9th Cir.), *cert. denied,* 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970)). As a result, "the section is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one

---

**5.** Employers must make these deposits on either a monthly or semi weekly basis depending on the total amount of withholdings. If the employer's withholdings from the previous year exceed $50,000 it must make deposits twice weekly, whereas if the total withholdings are less than $50,000, the employer need only make monthly deposits. Employers that withhold more than $100,000 must deposit the tax by the next banking day. INTERNAL REVENUE SERVICE, PUBLICATION 15, CIRCULAR E, EMPLOYER'S TAX GUIDE (2003).

**6.** For each whole or part month that form 941 is not filed when required, there is a penalty between 5% and 25% of the unpaid tax due with that return. Also, for each whole or part month the tax is paid late, a penalty of 0.5% per month generally applies. This penalty is 0.25% per month if an installment agreement is in effect. INTERNAL REVENUE SERVICE, PUBLICATION 15, CIRCULAR E, EMPLOYER'S TAX GUIDE (2003).

person." *White v. United States,* 372 F.2d at 516; *see also Feist v. United States,* 221 Ct.Cl. 531, 607 F.2d 954, 960 (1979); *Bolding v. United States,* 215 Ct.Cl. 148, 565 F.2d 663, 671 (1977); *Burack v. United States,* 198 Ct.Cl. 855, 461 F.2d 1282, 1291 (1972); *accord McCarty v. United States,* 194 Ct.Cl. 42, 54, 437 F.2d 961, 967; *Scott v. United States,* 173 Ct.Cl. 650, 354 F.2d 292, 296 (1965).

■ Thus, liability under section 6672 attaches only to those officers or directors with sufficient power and authority over the corporation that they may be considered a "responsible person"—*i.e.,* one responsible for withholding the employees' taxes.[7] In addition, as the text makes clear, section 6672 includes a *scienter* element requiring that the responsible person must have "willfully" failed to make the requisite withholdings. *Godfrey,* 748 F.2d at 1574; *see also Cook v. United States,* 52 Fed.Cl. 62, 68 (2002); *see also Emshwiller v. United States,* 565 F.2d 1042, 1045; *Vinick v. United States,* 205 F.3d 1, 3–4 (1st Cir.2000); *United States v. Landau,* 155 F.3d 93, 100 (2d Cir.1998), *cert. denied,* 526 U.S. 1130, 119 S.Ct. 1803, 143 L.Ed.2d 1007 (1999).

Therefore, this court's analysis centers on two inquiries: (1) whether Farkas was a responsible person within the meaning of IRC section 6672, and (2) whether be willfully failed to make the requisite withholdings. These analytical steps must be resolved *seriatim,* and "if the individual is not a responsible person, the analysis ends, and the individual cannot be found liable for the penalty imposed by section 6672." *Michaud v. United States,* 40 Fed.Cl. 1, 16 (1997). The burden of production and persuasion to refute these two elements lies upon the plaintiff where, as here, the government has established a *prima facie* case by presenting the assessments made against the plaintiff. *Id.* at 15 (citing *Pototzky v. United States,* 8 Cl.Ct. 308, 315 (1985)) ("Because IRS as-

sessments are entitled to a presumption of correctness, the defendant can make out a *prima facie* case by simply introducing the assessment into evidence ... Once that *prima facie* case is made out both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff.") This general rule holds true where the plaintiff has been assessed a penalty for a deficiency in the trust fund tax: "[i]n a trust fund 100% penalty assessment, the taxpayer bears the burden of production and persuasion." *In re Dakota Industries, Inc.,* 131 B.R. 437 (Bankr.D.S.D.1991); *see also Anderson v. United States,* 561 F.2d 162 (8th Cir.1977). As a result, the plaintiff must show by a preponderance of the evidence, that the government's imposition of the 100% penalty is erroneous. *See Cabot v. United States,* 38 Fed.Cl. 682 (1997); *Pototzky,* 8 Cl.Ct. at 315; *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975). Additionally, because the government's counterclaim relies on the same operative facts and legal conclusions as the plaintiff's claim, the taxpayer in effect carries the burden of proof both for his own claim and against the government's counterclaim. *See Michaud v. United States,* 40 Fed.Cl. 1, 15 (1997).

### 1. *Responsible Person*

■ IRC section 6671, which expands on section 6672, defines a responsible person as "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671 (2000). The guiding precedent interpreting section 6671 is the Federal Circuit's decision in *Godfrey v. United States,* 748 F.2d 1568 (Fed.Cir.1984). In *Godfrey,* the taxpayer, Mr. Godfrey, was a member of the Board of Directors of "Career Academics,

---

7. The Federal Circuit in *Godfrey* noted:

   The term "responsible person" is an invention of the courts, having no statutory definition or discussion in the legislative history. As the Supreme Court recently noted in *Slodov v. United States,*[ ] "[t]he cases which have been decided under § 6672 generally refer to the" person required to collect, truthfully account

for, and pay over any tax imposed by this title' by the shorthand phrase "responsible person." We use that phrase without necessarily adopting any of the constructions placed upon it in the decisions.

*Godfrey,* 748 F.2d at 1574 (citing *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)).

Inc." ("Career"), a company which provided, among other things, home-study and resident vocational training in such fields as radio broadcasting, medical and dental assisting, and architectural drafting. In the early 1970s, Career went into financial straits and became delinquent in paying its trust fund taxes. After Career filed for Chapter 11 bankruptcy, the IRS sought to hold Mr. Godfrey personally liable under section 6672 for unpaid taxes.

To determine whether Mr. Godfrey was a responsible person under section 6671, the court looked to the facts of prior cases to determine which powers held by a corporate director were indicative of a responsible person:

> where a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held responsible.

*Id.* at 1576 (citations omitted).

Since Mr. Godfrey exhibited none of these powers, the court found that he was not a responsible person. In so holding, the *Godfrey* court cited *White v. United States,* 178 Ct.Cl. 765, 372 F.2d 513 (1967), for another litany of powers indicative of a responsible person:

> In [*White* ], the president of the corporation was held liable because he directly controlled the secretary-treasurer in the latter's collecting, accounting for, and paying over the taxes. He was the president and 50 percent shareholder of a closely-held corporation. He actively conducted the day-to-day operations of the business: he came to the office daily, hired and laid off employees, ordered materials and supplies, conducted business correspondence, set the price of jobs, negotiated all contracts with customers, prepared invoices, disbursed corporate checks signed by him and the secretary-treasurer in payment officer's bills and other business expenses, and deposited the business receipts in the corporation's bank account. His address was used for receiving most business mail; his signature was required on all corporate

checks. He also drew a weekly salary from the corporation. Under these circumstances, the taxpayer was held to clearly fall within the category of responsible person because he had the authority to act, and did act, as fiscal manager of that company's affairs, and exercised authority over the general policy, affairs, and finances of the corporation.

*Id.* at 1575 (citing *White,* 178 Ct.Cl. at 768, 372 F.2d at 515) (internal quotations and citations omitted).

Application of *White* and *Godfrey* make clear that Mr. Farkas was indeed a "responsible person" as defined by law. To start, as President of ASI, Farkas had check signing authority. At trial, Mr. Farkas was adamant in his testimony that he rarely, if ever, signed ASI's checks. The issue, however, is not how many checks Farkas signed, but whether he had authority to do so. *See White,* 372 F.2d at 515. At trial, the government produced four checks from the fourth quarter of 1992 signed by Farkas. Joint Ex.'s 14–17. Moreover, before 1992, when Oleniacz was still at ASI, it was routine practice for the checks to be stamped with a rubber signature stamp of Mr. Farkas' signature when Oleniacz was not available. Tr. at 310.

In addition to his check signing authority, Farkas had hiring and firing authority, which he exercised on a regular basis in respect to both lower-level employees and upper management. When ASI was first getting off the ground, Farkas staffed the company with people including Dave Dent, James Bell and Terri Munkirs. Conversely, Farkas also had firing authority which he exercised to fire James Bell in 1991. The most obvious example of Farkas' firing power, however, is shown by his action firing his business partner and company Vice–President, John Oleniacz. Clearly, the termination of Mr. Oleniacz ultimately demonstrates that Farkas had almost plenary authority over the corporation because Oleniacz, along with Mr. Farkas, were co-fifty percent shareholders of ASI for nearly all of its corporate existence.

Mr. Farkas also had the authority to manage and direct employees in his company.

Although Farkas initially disclaimed such authority, upon cross examination he admitted that once the financial operations moved from Oleniacz' company to the financial department within ASI, he could have directed *anyone* at ASI, including the financial staff:

Q: So, for example, if you found out in the last quarter of 1992 that there was a payroll tax liability you could have directed the people in the corporation to pay that liability, couldn't you?

A: If indeed I found that out in the last quarter of 1992 and there were funds available, yes.

Tr. at 185. To elucidate this point, the court later asked point blank: "[d]id you have the authority to direct payment?" Farkas answered without hesitation: "Yes." Tr. at 187.

The corporate structure and stock distribution of ASI also plainly demonstrate that Mr. Farkas was its preeminent executive. Farkas' dominion over ASI stemmed from his status as a fifty percent shareholder of the company, a status the *Godfrey* court specifically found indicative of a responsible person. *Godfrey*, 748 F.2d at 1575. It is worth restating that as a fifty percent shareholder, Farkas' control over ASI's stock was checked only by Mr. Oleniacz, whom Farkas could, and did, fire. When additional stock was issued to James Bell in 1990, Bell received only 20,000 shares of ASI stock, compared to Farkas' and Oleniacz' 255,000 shares each. This new stock structure thus guaranteed that Farkas retained a substantial voting sway over ASI. Indeed, from 1987 to 1995, which include the critical tax periods in question, Farkas' control over ASI's decision making process was assured by being one of two Directors on ASI's Board—the other being Mr. Olenaicz until Farkas terminated his employment. Thereafter until 1995, Mr. Farkas was the sole Director on the ASI Board. All of the above make it patently clear that Farkas could authorize, if he so desired, ASI to pay its delinquent trust fund taxes. *See Godfrey*, 748 F.2d at 1576 (1984); *see also White*, 372 F.2d at 514; *McCarty*, 437 F.2d at 967–968, *Burack*, 461 F.2d at 1286, *Feist*, 607 F.2d at 960, *Marlowe v. United States*, 2 Cl.Ct. 711, 716 (1983).

Mr. Farkas contended at trial that his status and power was the result of chance more than design, and that he only handled the marketing aspect of ASI while Oleniacz handled the finances. He asserted that he and Oleniacz founded ASI as equal partners, evidenced by the fifty percent share each held in the company, and that his title as President and Oleniacz' title as Vice–President and Secretary/Treasurer were fortuitous and not at all a reflection of the authority each possessed in the company. Although this court finds this argument unpersuasive—especially since Farkas drew a larger salary than Oleniacz in 1991 and 1992 (Join Ex. 8, 9), and later fired Mr. Oleniacz—the question facing the court is not whether Farkas was the *only* person with authority in the company, but whether he did in fact have "power to compel or prohibit the allocation of corporate funds." *See White*, 372 F.2d at 516 (noting that section 6672 "is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one person").

In summary, whether their titles were chosen by lot or by design, it is clear that Mr. Farkas possessed all the authority, power and privileges outlined above during the fourth quarters of 1992 and 1994 such that he can be found a responsible person under section 6671. He exercised the authority to sign the company's checks and corporate tax returns, as well as the authority to direct the payment of the company's debts. Indeed, Farkas signed ASI's 1992 tax form which is the very centerpiece of this case. Joint. Ex. at 9. Moreover, Farkas had hiring and firing authority, hiring several employees throughout the existence of the company and, ultimately, firing John Oleniacz, ASI's Vice President. These powers alone, however, do not trigger liability. Farkas must, as discussed below, have "willfully" failed to pay the taxes.

2. *Willfulness*

█ In order to find that Farkas willfully failed to pay the tax, his failure need not have been accompanied by a specific intent to defraud the government of the monies, but rather there need be a showing of "personal fault;" a "voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing." *Slodov,* 436 U.S. 238, 98 S.Ct. 1778, 1789; *Godfrey,* 748 F.2d at 1576 (quoting *Scott v. United States,* 173 Ct.Cl. 650, 354 F.2d 292, 295 (1965)); *see also White v. United States,* 372 F.2d at 521 ("It is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness."). Alternatively, section 6672's wilfulness requirement can be satisfied by a showing that Farkas acted with "a reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Id.* (quoting *Feist,* 607 F.2d at 961). This recklessness showing can be met if the responsible person "knew or should have known of a risk that the taxes were not being paid, had a reasonable opportunity to discover and remedy the problem and yet failed to undertake reasonable efforts to ensure payment." *Cook,* 52 Fed.Cl. at 70 (citing *Whiteside v. United States,* 26 Cl.Ct. 564, 573–574 (1992), and *Hammon v. United States,* 21 Cl.Ct. 14, 27 (1990)); *see also Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987).

█ In the case *sub judice,* Farkas' failure to pay or direct payment of his company's withholding tax was indeed willful. To begin with, Farkas most likely had knowledge of ASI's tax deficiency as early as 1991, and certainly had knowledge of it by the fourth quarter to 1992. Both Greg Ward and John Tomlinson, the accountants for ASI, testified that the company's payroll tax deficiency was well known within the company. Tr. at 338–339, 388–389. In particular Greg Ward, whose testimony the court finds to be credible, testified that he would meet with Farkas twice a month to review the company's financial situation and that during those meetings ASI's tax liability was a major concern:

Q: So did these meetings that you had go through any discussions about the tax liabilities of ASI?

A: I'm sure they did.

Q: Did ASI have any difficulties with taxes?

A: At that point, I believe there were tax deficiencies and they were trying to work up a payment arrangement, I believe, at that time.

Q: In 1991?

A: Believe me, from the time I got there, that was one of the issues.

Tr. at 389. Farkas also admitted during cross-examination that he regularly reviewed ASI's 941 forms thus indicating that he had personal knowledge that the company's tax debt:

Q: Okay, now Mr. Ward gave you the Forms 941 for every quarter, didn't he?

A: Yes.

Q: And you say they had to be certified?

A: That's correct.

Q: And they had to be certified by a CPA?

A: That's correct.

Q: And by an owner of the business?

A: That's correct.

Q: And you were the owner of the business?

A: That's correct.

Q: And you're the one who certified them?

A: No. I certified that we had financials that were certified by a CPA. I didn't certify financials.

Q: Okay. You just certified that they were there. I understand you wouldn't certify that they were accurate under generally accepted accounting principles because that wasn't your job.

A: That's correct.

Q: But they were there in front of you?

A: That's correct.

Q: And you were certifying that these things, they are here, and they are in front of me right now?

A: ... All I did as the owner of the company is sign them and to say here they are.

Tr. at 195–196.

Of course, Farkas' knowledge of his company's tax deficiency alone is not enough to constitute willful failure to pay under section 6672. Farkas, however, also took the triggering steps of increasing his own salary in 1992, and paying other creditors while knowing of the tax debt.[8] Joint Ex. 9; Tr. at 392. There is also some credible evidence that Farkas was using ASI as his personal fiefdom throughout its corporate existence by paying for personal expenses out of corporate funds. Greg Ward testified as follows:

Q: And did any officer ever bill a personal expense to the company?

A: That was always an issue ...

Q: And let's just break it down. How about with Mr. Farkas?

A: I guess the issue there was travel.

Q: And what do you mean, travel?

A: Going back and forth to his home.

Q: Where was that?

A: Florida.

Q: Why was there an issue about him traveling back and forth to Florida?

A: At that point, one of the other officers had a concern about that.

Q: What was the concern?

A: That it wasn't business related...

Q: And did Mr. Farkas have the corporation pay any other personal expenses? Can you remember? ...

A: ... Rent, car, money for his family, whatever personal needs he had, he ran through the company.

Q: So he drew these out as loans?

A: Or credit cards or yes.

---

8. Greg Ward gave the following testimony in his deposition concerning Mr. Farkas' payment of creditors other than the United States:

    Q: Is it your understanding that he [Farkas] had authority to, I guess, pay creditors?...
    A: Yes
    Q: And can you give an example, if you remember?
    A: If we were, if insurance claims were behind or insurances, Steve [Farkas] would decide which one got paid first.

---

Q: And to your knowledge, he never paid this back?

A: To my knowledge, no.

Tr. at 394–395.

Mr. Farkas' knowledge of the tax debt in the fourth quarter of 1992 in conjunction with his decisions to pay personal expenses with corporate funds, to increase his own salary, and to pay other creditors before Uncle Sam show a deliberate failure to pay the back taxes, thus satisfying section 6672's wilfulness requirement. *See Feist,* 221 Ct.Cl. at 541, 607 F.2d 954 (citing *Bolding v. United States,* 215 Ct.Cl. 148, 565 F.2d 663 (1977); *Maggy v. United States,* 560 F.2d 1372 (9th Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978)) ("One who knows that the taxes are due and that the money is available for payment but who diverts the money to creditors of the corporation has often been viewed as having willfully disregarded the duty.").

As a rebuttal, Farkas repeatedly offers ASI's weekly $10,000 payments made to the IRS as proof that ASI had a payment plan arranged with the IRS and that the alleged payment plan negates Farkas' willful failure to pay. Farkas also asserts that the maintained payment plan stipulated that ASI's $10,000 payments be applied toward the principle of the debt, rather than toward the interest and penalties on the debt. Tr. at 118. The government vehemently denies the existence of such a plan.

Although Mr. Farkas did in fact make several $10,000 payments to the IRS, there is no credible evidence that an agreement or payment plan between ASI and the IRS ever existed, or that the plan stipulated whether the payments would go toward principle or toward interest and penalties. Farkas himself admitted at trial that, if there had been

---

Q: At what time period are you referring to?
A: The whole time I was there. There was always an issue with health insurances being cancelled. It was, it was a toss. There were ten balls in the air, which one needed to be paid first. And a lot of times it was either taxes, or one time unemployment came in to cease all their assets, so that had to be paid.
Tr. at 392.

any such agreement, it was not in writing or pursuant to any established IRS procedure. Tr. at 116–118. Farkas also never produced Form 433–D which is the tax form necessary to request a payment plan, and even if he did, then applicable section 6159(a) of the Internal Revenue Code requires installment payment plans to be in writing. 26 U.S.C. § 6159(a) (1988). In the absence of these documents, this court refuses to find that Farkas established a payment plan between ASI and the IRS such that it can be said he was not willful in failing to pay ASI's trust fund taxes. At most, the payments could be viewed as a contrived and futile attempt to stave off the IRS' impending liens and levies while Farkas continued to increase his own salary and pay personal expenses with corporate funds.

The absence of a documented payment plan also shatters Farkas' contention that the IRS should have accredited his $10,000 payments toward principle rather than interest or penalties. Then applicable Revenue Ruling 79–284, 1979 WL 51035 required that where a taxpayer makes an installment payment toward an employment tax deficiency but failed to give written instructions to the IRS as to how the payment should be applied, the IRS can allocate the payment to "tax, penalty or interest *in a manner serving its best interest.*" Rev. Rul. 79–284, 1979–2 C.B. 83, 1979 WL 51035 (emphasis added),[9] *superceded by* Rev. Proc.2002–26, 2002–15 I.R.B. 746, 2002 WL 545245; *see also Olson v. United States,* 133 B.R. 1016, 1018 (D.Neb. 1991), *modified on reconsideration,* 161 B.R. 45 (D.Neb.1992), *aff'd* 4 F.3d 562 (8th Cir.),

*cert. denied sub nom Needler v. Olson,* 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993). Revenue Ruling 79–284 makes clear that, without a written agreement stating otherwise, the IRS was free to apply the $10,000 payments in any way it saw fit.

Finally, even assuming, *arguendo,* that Farkas' failure to pay the tax was not "voluntary, conscious or intentional," his behavior regarding the alleged payment plan was sufficiently reckless to trigger liability under section 6672. At no time during the trial did Farkas allege or testify that he directed payment or that he instructed the $10,000 payments to be made. He testified that the arrangement was made by Oleniacz and Greg Ward, while Farkas was in Florida. Tr. at 116. He further testified that he did not know whether Oleniacz and Ward filed the proper Form 433–D, or even what From 433–D was. Tr. 118–119. Moreover, Farkas was well aware of Oleniacz' previous misappropriation of corporate funds for his personal use, a fact that Farkas emphasized and reemphasized at trial. Yet, when it came to the company's trust fund tax liability, he took Oleniacz at his word that a payment plan had been set up and that ASI's $1.4 million tax deficiency would be cured. Even in the face of a known tax deficiency, a crooked business partner, and a cratering business, Farkas made no attempt to ascertain whether the $10,000 payments would satisfy the entire tax debt, or whether the alleged payment plan was the result of a *bona fide* agreement with the IRS.[10] Farkas' treatment of the finances of ASI was the epitome of recklessness.

---

9. Revenue Ruling 79–284, 1979 WL 51035 reads as follows:

> Rev. Rul. 73–305, 1973 WL 32999 applies to withheld employment taxes and collected excise taxes where the taxpayer provides specific written instructions for the application of a voluntary partial payment. If no designation is made by the taxpayer, the Internal Revenue Service will allocate partial payments of withheld employment taxes and collected excise taxes to tax, penalty, or interest in a manner serving its best interest.

10. At one point in the trial, Farkas suggested he was unaware of the company's financial straits because the company's financial statements may have been lost on his disorganized desk.

Q: Mr. Ward did give you financials from time to time, as you have said, before Mr. Oleniacz left. Isn't that true?
A: He may have put them on the desk. He may not have. Did I look at them? What did I look at? No. When they were there, unless you put something on my desk—if you saw my desk right now, okay, it's not a place where you would put things that you wanted people to see. You would put it on the chair or somewhere else. Now, Mr. Ward may have come in and put the financials there. I know on many occasions Mr. Oleniacz would come in, see them there, pick them up and say these are not right. If you're asking me did I see the financials, did I go through the financials, was I now ignoring this, I'm saying no, I did not.

The court finds that Farkas' nonpayment of ASI's payroll trust fund tax liability for the quarter in question was willful, and to the extent that Farkas may have thought that the $10,000 weekly payments to the IRS constituted payment of the tax debt, any reliance on such a dubious and unwritten arrangement demonstrates a reckless disregard of an obvious and known risk that the taxes might not be paid in full. *See Slodov*, 436 U.S. 238, 98 S.Ct. 1778, 1789; *Godfrey*, 748 F.2d at 1576; *Scott v. United States*, 173 Ct.Cl. 650, 354 F.2d 292, 295 (1965); *see also Cook*, 52 Fed.Cl. at 70.

**B.** *The Government's Forfeiture Defense under 28 U.S.C. § 2514*

[6] In addition to its counterclaim under section 6672, the government has asserted an affirmative defense under section 2514 which reads:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (2000). Section 2514 amounts to a "silver bullet" which, in the present case, would require that Farkas' claim be forfeited if it is shown by clear and convincing evidence that Mr. Farkas acted or made false or misleading statements with the "intent to deceive the Government." *Miller v. United States*, 213 Ct.Cl. 59, 68, 550 F.2d 17, 22 (1977); *see also DeRochemont v. United States*, 23 Cl.Ct. 87 (1991). It is also important to note, especially in the present case, that the forfeiture statute includes not necessarily fraud *in factum*, but any *attempted* fraud against the United States. Such attempt must include a "deliberate, knowing intent to deceive the court into making a decision favorable to the plaintiff." *DeRochemont*, 23 Cl.Ct. at 89; *O'Brien Gear & Mach. Co. v. United States*, 219 Ct.Cl. 187, 199, 591 F.2d 666, 672 (1979).

As stated above, after the crash of ASI, Terri Munkirs formed a new company, PES, that was comprised of several old ASI branches and which was essentially identical to ASI.[11] Joint Ex. 60–65; Tr. at 322–323. Mr. Farkas was allegedly brought on by Munkirs as a consultant, however because of ASI's payroll tax deficiency, Ms. Munkirs and Mr. Farkas believed that the IRS would attempt to garnish any salary Farkas earned from PES through a lien or levy. Tr. at 346–349. This fear prompted Munkirs and Farkas to construct a fraudulent payment scheme whereby Stephen Farkas and his consulting company received little or no direct payment for services rendered to PES. Instead, the money that was to be paid to Farkas was paid to his wife, Diane Farkas, as though she were an employee of PES.

As a result, although Mr. Farkas was working to revamp PES' sales brochures, doing marketing for PES and providing managerial and consulting services (Tr. at 348), in 1997 his W2 tax form indicated only $2,900 in wages, while his wife's W2 from PES showed $86,415.95. Joint Ex. 78. And in 1998, Farkas reported no income at all, while his wife made $89,363.55. Joint Ex. 79.

Ms. Munkirs admitted to this fraudulent scheme twice at trial:

> I was afraid that if [Mr. Farkas'] company started doing work for me, that I would also be served with those papers and then he could no longer be a consultant to me. So it was at that point, [Mrs. Farkas] was already on the payroll, so I suggested that she, you know, that I pay what we were going to be paying Mr. Farkas' company through her.

Tr. at 347. Then later, she again testified:

> Q: Everything payable to Mr. Farkas was paid through his wife in that year, is that correct?
> A: That's correct.
> Q: It was paid ratably over the year?
> A: Through Mrs. Farkas' paycheck, yes.

Tr. at 351.

This court also finds incredible the testimony of Ms. Munkirs and Mr. Farkas that

---

**11.** The W2 tax forms issued by PES actually display the name "ASI Group, Inc." which further suggests there was little difference between old ASI and PES.

Mrs. Farkas' purpose vis-a-vis PES was anything more than to serve as a conduit through which Mr. Farkas could escape an IRS lien. Mr. Farkas testified:

> Actually, there were several reasons for putting her on the payroll. Number one, she had always—on the nursing side, she would always give us [help] if we [had] any kind of health questions concerning certain employees. She also did some marketing down there for us. Always tongue in cheek she'd say well, what am I going to get paid for this?
>
> Part of the reason was, you know, we were fighting the IRS, but I was always fearful that, you know, they could come in at any time and place a lien or a levy or whatever.

Tr. at 181. It defies reason to believe that Mrs. Farkas, while serving as a full-time nurse in Florida, could render enough nursing services or marketing leads to warrant an $80,000 salary from a company operating several states away in New Jersey. Ms. Munkirs' testimony in response to this court's questions makes this conclusion inexorable:

> THE COURT: ...I believe you testified that Diane Farkas was given a salary because of leads and because she gave medical advice?
>
> THE WITNESS: Medical advice, yes. She was basically—
>
> THE COURT: Could you tell me what leads?
>
> THE WITNESS: If she would read about new businesses that were opening up in Florida or if there were some Florida companies going out of business and, you know, they happened to mention that some of the clients that were, you know, part of that company that was going out of business, she would send us those leads so that we could get in touch with them and see if they would come with our company.
>
> THE COURT: Did you get in touch with any of them?
>
> THE WITNESS: Did I get in touch with any of them? The sales force did.
>
> THE COURT: What companies?
>
> THE WITNESS: That I—
>
> THE COURT: You don't know?

> THE WITNESS: I really don't know.
>
> THE COURT: Did it result in any business?
>
> THE WITNESS: No.
>
> THE COURT: It didn't result in business?
>
> THE WITNESS: It did not result in business.
>
> THE COURT: Okay, you also said that, you testified that she gave medical assistance?
>
> THE WITNESS: Yes.
>
> THE COURT: To whom?
>
> THE WITNESS: If our [Human Resources] Department, you know, had any questions as far as when we would screen people and who was going on our medical. You know, she would be our advisor in the event that we didn't understand what these people may have, you know, put on their form of what their conditions were.
>
> THE COURT: So these were employees or perspective employees?
>
> THE WITNESS: Yes, both.
>
> THE COURT: Both?
>
> THE WITNESS: Both.
>
> THE COURT: Can you give me any names of employees or perspective employees that she gave advice?
>
> THE WITNESS: It's been so long. No, I really—
>
> THE COURT: Your testimony is that she did, though?
>
> THE WITNESS: She did, yes.
>
> THE COURT: How many, do you know, about?
>
> THE WITNESS: Again, I don't know how many times our [Human Resources] Department would get in touch with her, because they're the ones that would handle it. I personally didn't handle that. Either the Sales Department did or the [Human Resources] Department did.

Tr. at 353–355.

It is clear to the court that the salary paid to Diane Farkas was not, in fact, payment for her own work, but was a deliberately transparent fraudulent scheme set up by Munkirs, Stephen Farkas and Diane Farkas in order to frustrate any efforts that the IRS might

take to collect the tax liability owed by Mr. Farkas under section 6672. In addition, the requirement of section 2514 that the attempted fraud be practiced "in the proof, statement, establishment, or allowance of the claim" is clearly met by the Farkas/Munkirs scheme. The elaborate, though ill-conceived, scheme to defraud the government was designed and carried out specifically to prevent the IRS's collection of the tax debt owed under section 6672, which is the very foundation of Farkas' claim. Accordingly, pursuant to 28 U.S.C. § 2514, the plaintiff's claim is forfeited.

### III. Conclusion

As this court has noted, "the penalty structure imposed by section 6672(a) is relatively rigid and unyielding; Congress intended it to be so to discourage officials of floundering companies from being tempted to use withheld taxes to stave off creditors." *Cook*, 52 Fed.Cl. at 74. When ASI's trust fund taxes came due, its directors, including Mr. Farkas, succumbed to the temptation to pay other creditors, its employees, and even their own increased salaries before paying the overdue tax that had been withheld from their employees' pay and held in trust. Whether Farkas controlled ASI's marketing department rather than its financial department is of no matter. He had the power, authority and control over the business to ensure that the trust fund taxes were paid, yet he willfully failed to do so. The only question remaining, then, is the amount of tax Farkas owes.

The government originally alleged that Farkas owed taxes from both the fourth quarter of 1992 as well as the fourth quarter of 1994. The taxes owed from the 1992 quarter amounted to $1,492,798.80, and those owed for the 1994 quarter amounted to $179.40. Combining these two amounts, the government alleged that Farkas owed a total of $1,492,978.20. The government has produced no concrete evidence, however, that Farkas is liable under 6672 for the taxes owed for the fourth quarter of 1994. As a result, this court finds Mr. Farkas liable for only the $1,492,798.80 assessed against him during the fourth quarter of 1992. This court subtracts from that number the $101.29

that Farkas previously paid toward that debt, bringing the total amount Farkas owes the government to $1,492,697.51. The court hereby orders the clerk to enter judgment in favor of the United States in the amount of $1,492,697.51.

**It is so ordered.**

No costs